United States Court of Appeals,

Fifth Circuit.

No. 92-7379.

FIRST UNITED FINANCIAL CORPORATION, Plaintiff-Appellee,

v.

SPECIALTY OIL COMPANY, INC.—I, and Sarah M. O'Dom, Defendants-Appellants.

Nov. 2, 1993.

Appeal from the United States District Court for the Southern District of Mississippi.

Before REAVLEY, SMITH, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

This case raises the issue of whether Southeast Mississippi Bank (the "Bank"), a predecessor-in-interest to First United Financial Corporation ("plaintiff"), was a bona fide purchaser of stock pledged by Sarah Myatt O'Dom's husband, Richard O'Dom. The district court found that the Bank was a bona fide purchaser, and consequently held that the plaintiff was the lawful owner of the stock and was further entitled to compel registration and delivery of the stock. Finding no error, we affirm.

I

Specialty Oil Company, Inc., a Louisiana corporation, was founded by the Myatt family in 1977. After her mother died in 1982, Sarah Myatt O'Dom received 170 shares of stock in Specialty Oil Company, Inc., which were reflected in a stock certificate dated August 1, 1977. Central Oil Distributing Company ("Central Oil"), a Mississippi corporation, was another Myatt family operation which started in the 1970s. In 1979, the name of that company was changed to Specialty Oil Company, Inc. In December 1983, Specialty Oil Company, Inc., the Louisiana corporation, and Specialty Oil Company, Inc., the Mississippi corporation, merged, which resulted in the Louisiana corporation becoming the surviving corporation. In February 1984, the surviving Louisiana corporation changed its name to Specialty Oil Company, Inc.—I.

In June 1983, Richard O'Dom, Sarah's husband, secured a loan from the Bank. As collateral,

Richard O'Dom pledged 165 shares of stock which he owned in Central Oil. In July 1984, Richard O'Dom secured a renewal promissory note from the Bank. In securing the renewal note, Richard O'Dom advised the Bank that Central Oil had merged with Specialty Oil Company, Inc., the Louisiana Corporation, and that his stock in Central Oil was being re-issued in the name of Specialty Oil Company, Inc. The original collateral of 165 shares of Central Oil stock was thereafter released to Richard O'Dom in trust for the purpose of re-issue. The release document stated that the stock issued to replace the Central Oil stock would be re-issued in the name of Sarah Myatt O'Dom.

In late July 1984, Richard O'Dom delivered to the Bank the stock certificate representing Sarah Myatt O'Dom's 170 shares of stock in Specialty Oil Company, Inc., along with a hypothecation agreement and an irrevocable power of attorney for transfer of stock, both signed by Sarah Myatt O'Dom. Although she signed the hypothecation agreement, Sarah Myatt O'Dom did not realize that the agreement permitted her husband to use her 170 shares of Specialty Oil Company, Inc. stock as collateral. She apparently signed the hypothecation agreement in blank and did not read the document. In November 1984, Sarah Myatt O'Dom, believing that her stock certificate for 170 shares of Specialty Oil Company, Inc. was lost, executed and tendered to Specialty Oil Company, Inc.—I a sworn affidavit affirming her belief. Specialty Oil Company, Inc.—I subsequently issued to her a substitute stock certificate.

In 1987, First United Bank ("First United"), a Mississippi corporation, purchased from the Bank Richard O'Dom's renewal note for the face value of the note.[1] At the time, Richard O'Dom had an unsecured loan with First United in an amount exceeding $100,000.00. First United apparently wanted the 170 shares of Specialty Oil Company, Inc. stock as collateral for its heretofore unsecured loan.

Richard O'Dom ultimately defaulted on the renewal note that had originated with the Bank. First United sued O'Dom, and obtained a judgment against him for the full amount of the indebtedness. First United thereafter requested that the Specialty Oil Company, Inc.—I ("defendant")

---

[1]At the time of the purchase, the Bank and First United were under common ownership. In June 1989, the Bank and First United merged, with the Bank becoming the surviving institution.

register the transfer of the 170 shares of Specialty Oil Company, Inc. stock to First United.  The

defendant refused, arguing that it had issued a substitute stock certificate to Sarah Myatt O'Dom upon

her representation that the original had been lost.

First United filed suit against the defendant in Mississippi state chancery court, seeking both

an adjudication that it was the lawful owner of the 170 shares of stock and an injunction compelling

registration and delivery of the stock.  The action was subsequently removed to federal court on the

basis of diversity jurisdiction.[2]  Before trial, First United Financial Corporation, as

successor-in-interest and assignee of First United's claim of ownership in the disputed stock,[3] replaced

First United as plaintiff.

After the non-jury trial, the district court ruled in favor of the plaintiff.  In its memorandum

opinion and order, the court found that the plaintiff had acquired the rights of its transferor, First

United, as well as the rights of the original holder, the Bank, both of which institutions were bona fide

purchasers for value without notice of any adverse claim.  The court accordingly held that the plaintiff

was the lawful owner of the stock and was entitled to receive an appropriate stock certificate

evidencing its ownership.  The district court entered a final judgment consistent with its memorandum

opinion and order, from which the defendant filed a timely notice of appeal.

II

In appealing the district court's judgment, the defendant does not dispute that the plaintiff

acquired the rights of First United, as well as the rights of the Bank, to the 170 shares of Specialty

Oil Company, Inc. stock.  Rather, the defendant contends that the district court erred in finding that

---

[2]We apply Louisiana substantive law to this diversity action because Louisiana is the home state of the stock's issuer, Specialty Oil Company, Inc.—I.  *See* La.Rev.Stat.Ann. § 10:8-106 (La. UCC) (West 1993) (stating that "[t]he law (including the conflict of laws rules) of the jurisdiction of organization of the issuer governs the ... rights and duties of the issuer with respect to ... registration of transfer of a certificated security");  Miss.Code Ann. § 75-8-106 (Miss. UCC) (West Supp.1991) (same).  Furthermore, because Louisiana has adopted the UCC provisions relevant herein, all sections will hereafter be cited to the UCC rather than to the specific Louisiana statute.

[3]During the merger of First United and the Bank, First United Financial Corporation—as the holding company owning all the capital stock of First United—took certain assets of First United as a dividend, including the judgment and collateral on Richard O'Dom's loans.

the Bank was a bona fide purchasers of the stock. Because a bona fide purchaser "acquires his interest in the security free of any adverse claim," UCC § 8-302(3), the defendant concedes that if the Bank and First United were bona fide purchasers,[4] then the plaintiff is the lawful owner of the disputed stock under the "shelter rule." *See* UCC § 8-301(1) (stating the "shelter rule" as follows: "Upon transfer of a security to a purchaser ..., the purchaser acquires the rights in the security which his transferor had or had actual authority to convey...."); *see also Abraham Lincoln Ins. Co. v. Franklin Sav. and Loan Ass'n,* 434 F.2d 264, 266 (8th Cir.1970) (stating that the rationale behind the "shelter rule" is "to protect the bona fide purchaser so that he can sell what he has purchased").[5]

A bona fide purchaser is "a purchaser for value in good faith and without notice of any adverse claim." UCC § 8-302(1). "Notice of any adverse claim" may be satisfied through either actual or constructive notice. *See id.* § 1-201(25) ("A person has "notice' of a fact when ... he has actual knowledge of it ... [or] has received a notice or notification of it ... [or] from all the facts and circumstances known to him at the time in question he has reason to know that it exists."); *see also Oscar Gruss & Son v. First State Bank of Eldorado,* 582 F.2d 424, 431 (7th Cir.1978) ("[E]ither actual or constructive notice will prevent one from obtaining the favored status of bona fide purchaser."). The defendant argues that the Bank had constructive notice of an adverse claim because: (a) the alleged suspicious circumstances surrounding the renewal loan gave the Bank reason to know;[6] and (b) the Bank knew that the transaction was for the individual benefit of the fiduciary,

---

[4]Although not explicit in the defendants' brief, we assume the defendant to also argue that First United was not a bona fide purchaser because it had knowledge of the same facts which allegedly gave the Bank constructive notice of an adverse claim. Contrary to the defendant's assertion at oral argument, First United's rights to the stock were not derivative of the Bank's rights under the "shelter rule," *see* UCC § 8-301(1), because the district court specifically found that First United was itself a bona fide purchaser of the stock.

[5]The defendant does not dispute the district court's finding that the plaintiff was a "purchaser" under UCC § 8-301(1).

[6]*See* UCC § 8-304 comment 1 ("[S]uspicious characteristics of the transaction may give a purchaser (particularly a commercially sophisticated purchaser such as a broker) "reason to know.' ").

Richard O'Dom.[7]  We address each of these arguments in turn.

A

The defendant first argues that the date on the tendered stock certificate—August 1, 1977—should have informed the Bank that the tendered stock was not the re-issued stock which Richard O'Dom promised.  The defendant contends that this "suspicious" circumstance charged the Bank with constructive notice of an adverse claim.  *See* UCC § 8-304 comment 1.  The district court disagreed, finding that "[t]he Bank ... had no reason to suspect that Sarah O'Dom had or would have an adverse claim to the stock certificate."  We review this factual finding for clear error.  *See United States v. Second Nat'l Bank of North Miami,* 502 F.2d 535, 547 (5th Cir.1974) (stating that when a determination of notice is "essentially factual, it should not be reversed unless clearly erroneous"), *cert. denied,* 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975);  *see also Oscar Gruss,* 582 F.2d at 430 (citing *Second Nat'l Bank* ).  "A finding is "clearly erroneous' when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed."  *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).  "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."  *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

As the district court pointed out, the Bank should have known from the discrepancy in dates that the tendered stock was not the re-issued stock which Richard O'Dom promised.  This was not a circumstance, however, which would lead one to suspect that the substituted stock was subject to an adverse claim.  Although the different ownership reflected by the tendered stock certificate was potentially a source of relevant suspicion, we note that Richard O'Dom informed the Bank prior to tendering his wife's stock certificate, that the stock was going to be in his wife's name.  Furthermore, the stock certificate was accompanied by a hypothecation agreement and irrevocable power of

---

[7]*See* UCC § 8-304(3) ("[I]f the purchaser ... has knowledge that the proceeds are being used or the transaction is for the individual benefit of the fiduciary or otherwise in breach of duty, the purchaser is charged with notice of adverse claims.").

attorney for transfer of stock, both bearing Sarah Myatt O'Dom's signature. The hypothecation agreement purported to grant Richard O'Dom the authority to pledge the stock for the renewal loan. Simply stated, the circumstances surrounding the renewal loan were not the tell-tale signs from which one would suspect that the tendered stock was subject to an adverse claim. Accordingly, we hold that the district court did not clearly err in finding that the Bank had no reason to know of an adverse claim based upon the circumstances surrounding the renewal loan.[8]

B

The defendant also argues that because the Bank knew that the securing of the renewal note was for the individual benefit of the fiduciary Richard O'Dom, it was charged with notice of an adverse claim. *See* UCC § 8-304(3); *see, e.g., In re Legel Braswell Gov't Sec. Corp.,* 695 F.2d 506, 511 (11th Cir.1983) (interpreting UCC § 8-304(3) to require "actual knowledge that the [transaction] was improper or in breach of a fiduciary relationship"); *Seattle-First Nat'l Bank v. Randall,* 532 F.2d 1291, 1297 (9th Cir.1976) ("The purpose of [UCC § 8-304(3) ] is to forbid the purchaser from claiming the protection of a *bona fide* purchaser when it has knowledge that the transaction is for the individual (personal) benefit of the fiduciary."). The defendant did not properly raise this issue at trial,[9] and thus raises this issue for the first time on appeal. "An issue raised for the first time on

---

[8]The defendant also argues that the Bank should be deemed to have notice of any adverse claim which would have been readily discoverable through reasonable commercial practices. The defendant's expert witness on banking procedures, William Mitchell, testified that the discrepancy in dates should have caused the Bank to inquire whether the substituted collateral was equal in value to the original collateral. In dismissing as inconsequential the Bank's failure to make this inquiry at the time the stock was tendered in 1984, the district court implicitly found that contacting the defendant to ascertain the value of the substituted stock would not have discovered Sarah Myatt O'Dom's adverse claim. Despite testimony to the contrary, this finding is plausible in light of the entire record because: (a) Sarah Myatt O'Dom did not report that her stock certificate had been lost until three months *after* her husband tendered the certificate to the Bank; and (b) the Bank did not discover any adverse claim when it requested and received financial statements from the defendant while attempting to ascertain the value of the substituted collateral in 1986.

[9]The defendant first raised the issue of notice under UCC § 8-304(3), in its post-trial rebuttal memorandum in support of its motion for rehearing. Although we have held that an issue first presented to a district court in a post-trial brief is properly raised below when a district court exercises its discretion to consider the issue, *see Southwestern Eng'g v. Cajun Elec. Power,* 915 F.2d 972, 979 (5th Cir.1990), there is no indication that the court considered the issue here. We further note that a ruling on notice under UCC § 8-304(3) required certain factual findings which the district court was not given the opportunity to make. Consequently, we conclude that the issue was not properly raised below. *See Whittaker Corp. v. Execuair Corp.,* 953 F.2d 510, 515

appeal generally is not considered unless it involves a purely legal question or failure to consider it would result in a miscarriage of justice." *Atlantic Mut. Ins. Co. v. Truck Ins. Exch.,* 797 F.2d 1288, 1293 (5th Cir.1986). Whether the Bank knew that the relevant transaction—the securing of the renewal loan—was for the individual benefit[10] of Richard O'Dom is essentially a question of fact. Moreover, the failure to consider this issue would not result in a miscarriage of justice. Indeed, consideration on appeal of who may have benefitted from the transaction, as well as the Bank's knowledge in this regard, would be prejudicial to the plaintiff, which was not given the opportunity to present evidence concerning these matters. Accordingly, we hold that the defendant cannot argue for the first time on appeal that the Bank was charged with notice under UCC § 8-304(3).[11]

## III

For the foregoing reasons, we AFFIRM.

---

(9th Cir.1992) (stating that although no "bright-line rule" exists to determine whether a matter has been properly raised below, " "a workable standard ... is that the argument must be raised sufficiently for the trial court to rule on it' " (quoting *In re E.R. Fegert, Inc.,* 887 F.2d 955, 957 (9th Cir.1989))); *see also Edmond v. United States Postal Serv. Gen. Counsel,* 949 F.2d 415, 422 (D.C.Cir.1991) (citing *E.R. Fegert* ).

[10]Sarah Myatt O'Dom and her husband were at all relevant times domiciled in Louisiana. Under Louisiana law, a loan or debt incurred by a spouse during marriage is presumed to have been incurred for the benefit of the community, thus constituting a community obligation. *See* La.Civ.Code Ann. art. 2361 (West 1985); *see also Cabral v. Cabral,* 543 So.2d 952, 954 (La.App. 5 Cir.1989, writ denied) (stating that to rebut the above presumption, a party must "show that the community would not have reaped the profits of the investment had it been successful").

[11]We further note that the defendant has not shown that the same facts which allegedly gave the Bank notice, also gave First United notice of an adverse claim. William Mitchell, the defendant's expert witness, testified that when First United purchased the rights to the stock from the Bank, the stock file contained Specialty Oil Company, Inc.-I financial statements, suggesting that someone at the Bank had inquired into the value of the stock. Therefore, the facts surrounding First United's purchase were not so "suspicious" as to give First United reason to know of an adverse claim.