**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 95-10438

QUEST MEDICAL, INC.,

                    Plaintiff - Counter Claimant -
                    Appellee,

VERSUS

EARL J APPRILL,

                    Defendant - Counter Claimant -
                    Appellant.

Appeal from the United States District Court
for the Northern District of Texas

April 12, 1996

Before POLITZ, Chief Judge, GOODWIN[1] and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

Appellant, Earl J. Apprill, ("Apprill") sued appellee, Quest Medical, Inc., ("Quest") under four alternative theories of liability for Appellee's alleged fraudulent conduct in a stock purchase transaction. After the jury returned a verdict in favor of Appellant on all theories, the district court, pursuant to Appellee's motion for judgment notwithstanding the verdict, reduced the jury's award of $270,000 actual damages and $500,000 exemplary damages to $101,027 of actual damages with no exemplary damages. Appellant appealed, and we affirm.

_____

[1]Circuit Judge of the Ninth Circuit, sitting by designation.

## I.   BACKGROUND

In the fall of 1988, Quest began negotiating with Apprill to purchase Apprill's stock in HemoTec, Inc.  Quest planned to launch a tender offer for HemoTec and needed to acquire certain large blocks of the stock before the tender offer could be successful. Quest represented to Apprill that the price offered for his stock ($4.625 per share) was equal to or higher than the price Quest would pay other large shareholders.  Quest presented Apprill a Stock Purchase Agreement which Apprill refused to sign because it contained a clause purporting to grant Quest discretion to delay subsequent closings contemplated by the Agreement during the pendency of the tender offer.  After Quest represented to Apprill that the provision did not give Quest the ability to delay the subsequent closings beyond April 1, 1989, Apprill signed the Agreement on January 6, 1989 and transferred most of his shares to Quest at the first closing on January 11.[2]

Quest launched its tender offer on January 19, offering $5.00 per share.  The tender offer continued until August 28.  On April 1, because the tender offer was still outstanding, Quest refused to purchase the rest of Apprill's stock, but demanded that Apprill sell his stock to Quest the day after the tender offer ended. Apprill refused and sold his shares to another purchaser at a

---

[2]Also on January 6, Quest purchased 175,000 HemoTec shares from Wellington Management Company for $5.00 per share.  On January 10, Quest paid Walter Braun $5.00 per share for his 239,322 shares. The stock purchase agreement between Quest and Walter Braun further provided that Braun's purchase price would be adjusted upward to include a portion of any profit realized by Quest should Quest dispose of the shares within 270 days of the purchase date.

higher price.

Quest sued Apprill for breach of contract. Apprill counterclaimed asserting four different theories of liability based on Quest's misrepresentations.[3] At the first trial, the jury found that Apprill breached the Agreement by refusing to sell the remainder of his stock to Quest. The jury rejected Apprill's Rule 10b-5, Texas Business and Commerce Code ("§ 27.01"), and Texas Securities Act ("TSA") counterclaims, but concluded Apprill had established his common-law fraud counterclaim. The jury made awards in favor of each party against the other, and the district court entered a net judgment in favor of Apprill. Both parties appealed. In an unpublished disposition, we affirmed the verdict on Quest's breach of contract claim, remanding solely for redetermination of the amount of Quest's damages. Conversely, we reversed the jury's findings on Apprill's four counterclaims and remanded those claims to the district court for a new trial.

On remand, Quest moved for summary judgment, inter alia, on the amount of its damages for Apprill's breach of contract. The district court granted the motion only as to damages awarding Quest $105,493. The district court then set Apprill's fraud claims for trial, bifurcating the exemplary damages issue. The jury returned a verdict for Apprill on all four theories of recovery. Although

---

[3]Apprill contended that Quest's misrepresentations violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, Tex. Bus. & Comm. Code Ann. § 27.01 (West 1987) (i.e., statutory fraud), Tex. Rev. Civ. Stat. Ann. art. 581-33B (West Supp. 1996) (i.e., the Texas Securities Act), and Texas common-law fraud principles.

3

instructed on the elements of all four theories, the jury received a single damages instruction. The jury awarded Apprill $270,000 in actual damages and, after completing the bifurcated portion of the trial, awarded him $500,000 in exemplary damages. Apprill moved for judgment on the verdict, and Quest sought judgment notwithstanding the verdict ("JNOV"). The district court denied Apprill's motion and granted Quest JNOV.

The district court concluded the evidence did not support an award of actual damages of $270,000. The district court calculated the actual damages supported by the evidence under each of Apprill's theories of recovery. On Apprill's § 27.01 and common-law fraud claims, the court concluded that Apprill incurred no out-of-pocket loss and that his benefit-of-the-bargain loss was only $16,740.[4] The district court further concluded that $500,000 in

---

[4]One who commits fraud as proscribed by § 27.01 is liable for "actual damages." Tex. Bus. & Com. Code Ann. § 27.01(b) (West 1987). The statute, however, does not define actual damages. In the absence of such a statutory definition, Texas courts generally look to the common law for guidance, see, e.g., W.O. Bankston Nissan, Inc. v. Walters, 754 S.W.2d 127, 128 (Tex. 1988) ("This court has defined actual damages [under the Texas Deceptive Trade Practices Act] as those recoverable at common law."); Brown v. American Transfer & Storage Co., 601 S.W.2d 931, 939 (Tex.) ("Actual damages means those recoverable at common law."), cert. denied, 449 U.S. 1015 (1980); Waldon v. Williams, 760 S.W.2d 833, 835 (Tex. App. - Austin 1988, n.w.h.) (construing Tex. Prop. Code Ann. § 92.056(b)(4) (redesignated as Tex. Prop. Code Ann. § 92.0563(a)(4) (West 1995))); Frank B. Hall & Co. v. Beach, Inc., 733 S.W.2d 251, 265 (Tex. App. - Corpus Christi 1987, writ ref'd n.r.e.) (construing Tex. Ins. Code Ann. art. 21.21 § 16(b)(1) (West Supp. 1996)), such that the measure of damages recoverable under § 27.01 is the same as that under a claim of common-law fraud. Accordingly, we note that the Texas Supreme Court has recognized:

  [u]nder common law, there are two measures of damages for misrepresentation: (1) the "out of pocket" measure, which is the "difference between the value of that which was parted with and

4

exemplary damages was unreasonable in light of such a small actual damage award and that no reasonable amount of exemplary damages, when added to $16,740, would exceed Apprill's recovery under the TSA. Accordingly, the district court did not determine an appropriate amount of exemplary damages under these theories. On Apprill's TSA claim, the district court found sustainable damages of $101,027, basing its calculation on the 44,639 shares actually transferred by Apprill to Quest. The district court held exemplary damages were not recoverable under the TSA. Finally, as to Apprill's Rule 10b-5 claim, the district court refused to reach the damages issue because it was "satisfied that such damages, even if recoverable, would amount to no more than those recoverable under [the TSA]." Thus, the district court concluded that Apprill could only recover damages under one theory of recovery, that the TSA afforded Apprill the largest recovery, that the TSA did not provide for exemplary damages, and that Apprill's TSA damages were

---

the value of that which was received"; and (2) the "benefit of the bargain" measure, which is the difference between the value as represented and the value actually received.

W.O. Bankston Nissan, Inc., 754 S.W.2d at 128.

   Applying these damages formulas, the district court first found that Apprill received $4.625 per share. Next, the district court determined Apprill parted with only $4.1875 per share, the closing price of HemoTec stock on January 6, 1989, thereby incurring no out-of-pocket loss. With respect to the benefit-of-the-bargain measure, the district court found that Quest represented to Apprill that he would receive the same price being paid other large shareholders--i.e., Wellington Management Company was paid $5.00 per share and Braun received $5.00 per share plus a "kicker." As such, Apprill's benefit-of-the-bargain damages on the 44,639 shares actually transferred to Quest were $16,739.625 [($5.00 per share - $4.625 per share) X 44,639].

5

$101,027.[5] Accordingly, the district court entered net judgment in favor of Quest. Apprill appealed.

Apprill contends the district court erred by: (1) finding that the record did not support the jury's award of $270,000 in actual damages on his § 27.01 and common-law fraud claims; (2) concluding that the $500,000 in exemplary damages assessed by the jury was not reasonably proportioned to the actual damages awarded under the § 27.01 and common-law fraud theories; (3) holding that the TSA does not provide for the recovery of exemplary damages; and (4) basing Apprill's TSA damages only on the 44,639 shares actually transferred to Quest, and not on the entire 61,239 shares covered by the Agreement. Additionally, Apprill maintains the district court erred by entering judgment for Quest on its breach of contract claim and by imposing an incorrect interest rate for computing prejudgment interest owed by Apprill on Quest's breach of contract award. We find no merit in Apprill's contentions and affirm.

---

[5]Under Texas law, "[w]hen a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief." Boyce Iron Works, Inc. v. Southwestern Bell Tel. Co., 747 S.W.2d 785, 787 (Tex. 1988). If prior to judgment the prevailing party fails to elect between the alternative theories, the court should utilize the findings affording the greater recovery and render judgment accordingly. Birchfield v. Texarkana Memorial Hosp., 747 S.W.2d 361, 367 (Tex. 1988).

The parties do not dispute the accuracy of these statements of Texas law. Instead, the gist of this dispute is whether the district court correctly concluded that the TSA afforded Apprill the greatest recovery.

II.  DISCUSSION

Apprill's appeal proceeds against the backdrop of the district court's granting Quest JNOV.  We review rulings on motions for JNOV de novo, applying the same standard as the district court, Crist v. Dickson Welding, Inc., 957 F.2d 1281, 1285 (5th Cir.), cert. denied, 506 U.S. 864 (1992), which directs us to "view the evidence in the light most favorable to the party opposing the motion, and sustain the JNOV 'only if we find that on all the evidence no reasonable juror could arrive at a verdict contrary to the district court's conclusion,'" Allied Bank-West, N.A. v. Stein, 996 F.2d 111, 114 (5th Cir. 1993) (quoting Ellison v. Conoco, Inc., 950 F.2d 1196, 1203 (5th Cir. 1992), cert. denied, 509 U.S. 907 (1993)).

## A.  Actual damages

### 1.  § 27.01 and common-law fraud theories

Apprill argues that the record supports the jury's award of $270,000 in actual damages under his § 27.01 and common-law fraud theories.  His argument is two-fold.

#### a.  Out-of-pocket measure of damages

The district court found that the parties stipulated that the value of HemoTec stock on the date of sale was $4.1875 per share. The parties stipulated this was the closing price of the stock on that date.  The district court must determine the fair market value of the stock to properly compute out-of-pocket damages.

Apprill advocates that the district court should have determined the fair market value of the stock by employing by

analogy the valuation technique used in stock conversion cases.[6]

Had it done so, the district court would have found evidence that

HemoTec stock reached a high of $10.75 per share on August 28,

1989, and that Apprill testified he would not have sold his stock

had he not been misled by Quest.[7] From these facts, the jury could

have inferred that Apprill would have held his stock and profited

---

[6]      The measure of damage in a stock conversion suit is the
       market value of the stock at the time of the conversion.
       If the conversion of the stock is attended by fraud, wilful
       wrong, or gross negligence, then the measure of damages is
       the highest market value between the date of the conversion
       and the filing of suit.

Patterson v. Wizowaty, 505 S.W.2d 425, 427 (Tex. Civ. App. -
Houston [14th Dist.] 1974, n.w.h.) (citations omitted). See also
De Shazo v. Wool Growers Cent. Storage Co., 162 S.W.2d 401, 404
(Tex. 1942).

[7]The testimony relied upon by Apprill was as follows:

Q  Did Mr. Thompson tell you during this conversation that in
December, a few weeks before this he had offered Mr. Braun five
dollars a share and was going to offer Mr. Braun five dollars a
share again?

A  No, sir.

Q  If Mr. Thompson told you that, would you have sold at four
and five eighths?

A   Is your question if Mr. Thompson had told me that he was
paying five dollars would I have sold for less than that five
dollars?

Q  Yes.

A  Absolutely not.

Q  Why not?

A  Because he assured me I was getting a premium for my stock,
and he told me that I would get the highest price possible, and
I would get at least the same amount or more than what he would
pay for Wellington or Mr. Braun.

8

from the large increase in its value, since the stock conversion method allows consideration of later values. See supra note 6.

That the parties stipulated that "[o]n January 6, 1989, the closing price for Hemotec stock was $4.1875 per share" is true. (Emphasis added). However, the distinction Apprill attempts to draw between the price at which HemoTec stock last traded on January 6 and the market value of HemoTec stock on that date is untenable. "According to the classic formulation, '[f]air market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'" Amerada Hess Corp. v. Commissioner, 517 F.2d 75, 83 (3d Cir.) (citing United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting Treas. Reg. § 20.2031-1(b))), certs. denied, 423 U.S. 1037, 1037 (1975). See also Keener v. Exxon Co., USA, 32 F.3d 127, 132 (4th Cir. 1994), cert. denied, __ U.S. __, 115 S.Ct. 1108 (1995); United States v. Campbell, 897 F.2d 1317, 1322 (5th Cir. 1990); Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., 793 F.2d 1456, 1461 (5th Cir. 1986), certs. denied, 479 U.S. 1034, 1089 (1987). "Where . . . the property to be valued consists of securities traded on a stock exchange, the general rule is that the average exchange price quoted on the valuation date furnishes the most accurate, as well as the most readily ascertainable, measure of fair market value." Amerada Hess Corp., 517 F.2d at 83 (footnote omitted). See also Barry v. Smith (In re New York, N. H. & H. R.R.), 632 F.2d 955, 962-63 (2d Cir.),

9

cert. denied, 449 U.S. 1062 (1980).

When computing out-of-pocket loss, the valuation date is the date of sale--i.e., January 6, 1989.  Although no evidence of the mean exchange price of HemoTec stock on this date was submitted, the parties did stipulate that the closing price on January 6 was $4.1875 per share.  Under federal law, stipulations of fact fairly entered into are controlling and conclusive and courts are bound to enforce them, see United States Abatement Corp. v. Mobil Exploration & Prod. U.S., Inc. (In re U.S. Abatement Corp.), 79 F.3d 393, 400 (5th Cir. 1996); Holiday Inns, Inc. v. Alberding, 683 F.2d 931, 935 (5th Cir. 1982); A. Duda & Sons Coop. Ass'n v. United States, 504 F.2d 970, 975 (5th Cir. 1974), unless manifest injustice would result therefrom or the evidence contrary to the stipulation was substantial, see Donovan v. Hamm's Drive Inn, 661 F.2d 316, 317 (5th Cir. 1981); Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1232 (5th Cir. 1978).

The district court admitted an exhibit of reports prepared by NASDAQ[8] that detailed the high ($4.3125), low ($4.1875), and closing ($4.1875) price per share on January 6.  Additionally, Apprill submitted an exhibit demonstrating the computation of his alleged damages under the TSA which represented the value of HemoTec stock on the date of sale to be $4.1875 per share.  This evidence was supportive of, not contrary to, the parties' pretrial

_____

[8]"NASDAQ," National Association of Securities Dealers Automated Quotations, is an automated information system that provides brokers and dealers with price quotations on securities traded in the over-the-counter market.

stipulation. Further, because Apprill prepared and submitted the TSA damages exhibit, we see no manifest injustice in requiring him to stand behind his evidence or in accepting the pretrial stipulation.

Next, the record shows Apprill first argued that the jury's $270,000 actual damages figure could be arrived at by employing an out-of-pocket damages calculation based on an analogy to stock conversion cases in his memorandum in opposition to Quest's JNOV motion. The jury was never presented this theory. Instead, the jury received a single damages instruction:

> If you find that material misrepresentation(s) by Quest caused some injury or damage to Apprill, you must then determine the amount of that injury or damage in monetary terms. In that respect, you should award to Apprill an amount of money shown by a preponderance of the evidence to be fair and adequate compensation for all loss or damage caused by Quest's wrongful conduct.
>
> Apprill's damages can be measured in two ways: the "out of pocket' measure, which is the difference between the price he received for his HemoTec shares and the market value of those shares at the time of the transaction with Quest, or the "benefit of the bargain" measure, which is the difference between the value of the shares as represented by Quest and the value Apprill actually received.

Apprill's only objection to this charge was that it did not contain an instruction on the mandatory damages provision of the TSA or on this Circuit's Rule 10b-5 out-of-pocket measure of damages.

A district court has discretion to consider new theories raised for the first time in a post-trial brief, Abbott v. Equity Group, Inc., 2 F.3d 613, 629 n.59 (5th Cir. 1993) (citing United States ex rel. Am. Bank v. C.I.T. Constr. Inc. of Tex., 944 F.2d 253, 259 n.8 (5th Cir. 1991)), cert. denied, __ U.S. __, 114 S.Ct.

11

1219 (1994), and an issue first presented to the district court in a post-trial brief is properly raised below when the district court exercises its discretion to consider the issue, Southwestern Eng'g Co. v. Cajun Elec. Power Coop., 915 F.2d 972, 979 (5th Cir. 1990). The record does not indicate that the district court ever considered the applicability of the stock conversion analogy. Further, Apprill submitted this theory only after the jury, the ultimate fact finder in this case, rendered its verdict. Apprill, therefore, called upon the district court, and now calls upon us, to speculate that the jury not only divined this intricate formula for computing actual damages without any instruction from counsel or the court, but also extracted from the record the evidence Apprill alleges supports an award of $270,000. We decline to so speculate and note that "[t]his Court does not look with favor upon tardy arguments that are brought to the lower court's attention post-trial after counsel has had the opportunity to salvage what [he] may from the record."[9] Risher v. Aldridge, 889 F.2d 592, 595

---

[9]As noted in note 6, supra, damages in a stock conversion case tainted by fraud, wilful wrong, or gross negligence are based on the highest market value attained by the stock between the conversion and filing of suit. The evidence submitted by the parties concerning the changing value of HemoTec stock only canvassed the period from the execution of the Agreement on January 6, 1989, to the termination of the tender offer on August 28, 1989. Suit was filed November 7, 1989.

Further, while Apprill argues that the highest price for the stock during this period was $10.75 per share, this was actually the closing price on the date the stock reached its highest value. The highest price at which HemoTec stock traded during the period covered by the evidence was $11.00 per share. Thus, out-of-pocket expenses under a stock conversion analogy would be $285,574 using the $11.00 per share fair market value, instead of the $273,414 advocated by Apprill using the $10.75 per share fair market value

(5th Cir. 1989).  Consequently, we conclude this issue was not properly raised below, and therefore is raised for the first time on appeal.  See First United Fin. Corp. v. Specialty Oil Co., Inc.-I, 5 F.3d 944, 948 & n.9 (5th Cir. 1993).

We are a court of errors, and will not consider matters raised for the first time on appeal, unless our failure to do so would result in manifest injustice.  Brantley v. Surles, 804 F.2d 321, 324 (5th Cir. 1986).  "Manifest injustice, however, exists in extreme circumstances."  American Int'l Trading Corp. v. Petroleos Mexicanos, 835 F.2d 536, 540 (5th Cir. 1987).  We have found such circumstances lacking where a party raises for the first time on appeal an argument aimed at revising the method of computing damages.[10]  Such circumstances likewise are lacking here, and so we refuse to consider Apprill's stock conversion analogy initially on appeal.

### b.    Benefit-of-the-bargain measure of damages

---

figure.

[10]See, e.g., American Int'l Trading Corp., 835 F.2d at 540 (precluding a party from arguing for the first time on appeal that Mexican law, rather than Texas law, applies because the damages computation would be radically different under Mexican law); Brantley, 804 F.2d at 324 (refusing to address party's contention that social security benefits were improperly deducted from her award of back pay because she did not complain in the district court); White Farm Equip. Co. v. Kupcho, 792 F.2d 526, 529 (5th Cir. 1986) (refusing to consider argument that settlement agreement should be governed by Tex. Bus. & Com. Code Ann. § 35.62, which would place a greater value on an element of the settlement calculus, because the argument was first made on appeal); Sowell v. Natural Gas Pipeline Co., 789 F.2d 1151, 1155 n.4 (5th Cir. 1986) (holding party's argument that data used in calculating damages included unlawful prices was waived because not raised before the district court).

13

Alternatively, Apprill attacks the district court's computation of his benefit-of-the-bargain loss because the district court found the "represented value" of the stock to be $5.00 per share, when the evidence reveals that one shareholder was paid approximately $6.00 per share. To support the $6.00 per share amount, Apprill points to a single statement at trial by Quest's President:

> Q  How much did you ultimately pay to Walter Braun?
>
> A  I don't remember. As we discussed earlier, we paid him about a million two, and if I'm not mistaken eventually we paid him two hundred thousand more dollars. So I think it's about a million four which was probably about six dollars a share, something like that.

Without addressing whether $5.00 per share or $6.00 per share is the appropriate "represented value" of the stock, we recognize that neither value gives rise to a benefit-of-the-bargain loss even remotely approaching $270,000.[11]  Additionally,

> Under Texas law, damages must be established with a reasonable degree of certainty. "There can be no recovery for damages which are speculative or conjectural." The damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts. Furthermore, "[w]hile mathematical precision is not required to establish the extent or amount of one's damages, one must bring forward the best evidence of the damage of which the situation admits, and there must be some basis for reasonable inferences."

Richter, S.A. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 939 F.2d 1176, 1188 (5th Cir. 1991) (citations omitted). The lone statement

---

[11]As demonstrated supra note 4, the benefit-of-the-bargain loss using a "represented value" of $5.00 per share is $16,740. Using $6.00 per share, the loss increases to $61,379 (i.e., [$6.00 per share - $4.625 per share] X 44,639 shares).

14

by Quest's President fails to substantiate with the requisite certainty Apprill's claim that the "represented value" of his HemoTec stock was $6.00 per share.

## 2. TSA theory

Apprill's sole complaint about the district court's TSA actual damages calculation is that the computation does not account for all 61,239 shares of HemoTec stock encompassed by the Agreement. He contends the record contains ample evidence that he would not have sold any of his stock absent Quest's misrepresentations.[12] The district court, however, excluded from the TSA damages calculation the 16,600 shares Apprill refused to deliver to Quest.

The TSA provides:

> In damages, a seller shall recover (a) the value of the security at the time of sale plus the amount of any income the buyer received on the security, less (b) the consideration paid the seller for the security plus interest thereon at the legal rate from the date of payment to the seller.

Tex. Bus. & Com. Code Ann. 581-33(D)(4) (West Supp. 1996). Apprill's trial exhibit showing his proposed calculation of his TSA damages includes figures for both income allegedly received by Quest on the 16,600 shares and the amount allegedly paid by Quest for those shares. Quest disputes the soundness of Apprill's calculation, pointing out that it never paid Apprill anything for these shares because Apprill refused to go forward with the sale, that it received no income on these shares because it never obtained ownership of them, and that the amount Apprill designates

_____

[12]Apprill again relies solely on his testimony quoted supra in note 7.

15

as income received by Quest is actually the amount of damages Quest was awarded on its breach of contract claim.  We recognize that to award Apprill recovery for shares which he never conveyed to Quest, and instead sold to a third party at a price higher than that offered by Quest, would contravene the plain language of Article 581-33D(4) and would afford him an unwarranted windfall.

**B.    *Exemplary damages***

### 1.    § 27.01 and common-law fraud theories

Initially, Apprill argues that, if we sustain the jury award of actual damages of $270,000 under the § 27.01 and common-law fraud theories, we must conclude that the $500,000 exemplary damages award is reasonable.  This argument fails in light of our affirmance of the district court's conclusion that the evidence does not support $270,000 of actual damages.  Next, Apprill contends that $500,000 is not unreasonable or disproportionate when compared with actual benefit-of-the-bargain damages under his § 27.01 and common-law fraud theories of $61,379.[13]  Again, Apprill's contention falters insofar as we hold the district court correctly computed benefit-of-the-bargain damages to be only $16,740.  Apprill, however, further contends that, if the correct amount of actual damages under his § 27.01 and common-law fraud claims is $16,740, an exemplary damages award of $500,000 still is not unreasonable, and thus the district court erred in concluding

----

[13]See supra note 11.

16

otherwise.[14] We are asked, therefore, to determine whether the district court correctly concluded that $500,000 in exemplary damages was unreasonable in the face of a $16,740 actual damages award.

Where state law provides the basis for decision, the propriety of an award of exemplary damages and the factors the jury may consider in determining their amount are questions of state law. Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 278 (1989). Texas law provides that "[f]raudulent misrepresentations used to induce the creation of a contract, coupled with damages caused by the misrepresentation, will support an award for exemplary damages." Artripe v. Hughes, 857 S.W.2d 82, 87 (Tex. App. - Corpus Christi 1993, writ denied). See also Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 436 (Tex. 1986); Trenholm v. Ratcliff, 646 S.W.2d 927, 933 (Tex. 1983). In response to special interrogatories, the jury found that Quest made misrepresentations to Apprill with the intent of inducing Apprill to enter into the Agreement. Accordingly, the parties agree that exemplary damages are recoverable under Apprill's § 27.01 and

---

[14]Apprill argues that the ratio of actual damages to punitive damages in this situation is 16.6 to 1, which is acceptable under Texas law. He arrives at this ratio by adding to actual damages of $16,740 prejudgment interest, calculated from January 11, 1989, to November 14, 1994, at the rate of 10% per annum compounded daily (i.e., $13,299) for a total of $30,039. The ratio of $500,000 to $30,039 is 16.6 to 1. We take no position on the accuracy of these calculations, or on the correctness of the assumptions underlying them, but simply note that our review of Texas case law indicates that prejudgment interest is not typically included when determining the proportionality of actual damages to punitive damages. Accordingly, we reject Apprill's attempt to do so.

17

common-law fraud causes of action. The dispute concerns the appropriate amount, if any, of such damages on these facts.

Texas law requires that exemplary damages be reasonably proportioned to actual damages. Alamo Nat'l Bank v. Kraus, 616 S.W.2d 908, 910 (Tex. 1981). This proportionality requirement, however, is merely a tool to aid in determining whether the award is the product of the jury's passion or reason. Glasscock v. Armstrong Cork Co., 946 F.2d 1085, 1095 (5th Cir. 1991) (citing Wright v. Gifford-Hill & Co., 725 S.W.2d 712, 714 (Tex. 1987)), cert. denied, 503 U.S. 1011 (1992). Indeed, "[t]here can be no set rule or ratio between the amount of actual and exemplary damages which will be considered reasonable. This determination must depend upon the facts of each particular case." Kraus, 616 S.W.2d at 910. Accordingly, to determine whether a particular award of exemplary damages is reasonable, Texas law requires the reviewing court to view the facts in light of: "(1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety." Id.

In rejecting the jury's $500,000 exemplary damages award as unreasonable, the district court referred to our decision in Maxey v. Freightliner Corp., 665 F.2d 1367 (5th Cir. 1982) (en banc). In Maxey, we concluded that a ratio of approximately 3 to 1 provided a good rule of thumb for reviewing the reasonable proportional relationship of exemplary damages to actual damages under Texas

18

law.   665 F.2d at 1377-78 (discussing <u>Miley v. Oppenheimer & Co.</u>, 637 F.2d 318 (5th Cir. 1981)).   Although we have recognized more recently that Texas courts have not adopted a set ratio that will make an award of exemplary damages per se reasonable, <u>see</u> <u>Brown v. Petrolite Corp.</u>, 965 F.2d 38, 48 (5th Cir. 1992); <u>Glasscock</u>, 946 F.2d at 1095, we nonetheless cannot ignore that the ratio in this case, after properly reducing Apprill's actual damages, approaches 30 to 1.

Apprill was paid a price higher than that at which HemoTec stock traded on the day the Agreement was executed.  Also, though the evidence demonstrated that Quest's net worth on September 30, 1993, was $18,693,037, Quest had net operating income of approximately $300,000 in 1993 and a net operating loss of approximately $200,000 in 1992.[15]  Further, Quest had never before been accused of engaging in similar fraudulent conduct.  Finally, unlike in personal injury cases where monetary damages cannot replace a lost life or restore a maimed body, the injury in this case was purely financial and an award of compensatory damages is capable of making the injured party, Apprill, completely whole. "Punitive (or exemplary) damages are levied against a defendant to punish [it] for outrageous, malicious, or otherwise morally culpable conduct," <u>Transportation Ins. Co. v. Moriel</u>, 879 S.W.2d 10, 16 (Tex. 1994), and "for the public purpose of punishment and

---

[15]Net worth is relevant to the issue of punitive damages, <u>Lunsford v. Morris</u>, 746 S.W.2d 471, 473 (Tex. 1988), and "[a] defendant's 'ability to pay' bears directly on the question of adequate punishment and deterrence," <u>id</u>. at 472.

deterrence," id. at 17.  While we do not in any respect condone Quest's conduct, we cannot say that the district court erred by concluding that $500,000 of exemplary damages was more than was necessary and proper to serve the public concerns of punishing and deterring Quest.  Further, the district court did not err in holding that any appropriate amount of exemplary damages, when added to $16,740, would not be sufficient to exceed Apprill's over $101,000 recovery under his TSA claim.

### 2.    TSA theory

The TSA imposes liability on those who buy or offer to buy securities by means of an untrue statement of material fact.  Tex. Rev. Civ. Stat. Ann. art. 581-33B (West Supp. 1996).  An aggrieved seller may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security.  Id.  With deliberate detail, the TSA provides precisely what sums such a seller may recover including compensatory damages, costs, and attorney's fees.  Tex. Rev. Civ. Stat. Ann. art. 581-33D(2), (4), (6)-(7) (West Supp. 1996).  Further, Article 581-33(M) provides that "[t]he rights and remedies provided by this Act are in addition to any other rights (including exemplary or punitive damages) or remedies that may exist at law or in equity."  Tex. Rev. Civ. Stat. Ann. art. 581-33M (West Supp. 1996).

The district court held exemplary damages were unavailable under the TSA.  Apprill, however, argues that he is entitled to recover exemplary damages under the TSA, and that $500,000 in exemplary damages is reasonably proportional to his TSA award of

20

over $101,000 in actual damages.  Apprill relies on the lack of language expressly excluding such a recovery and on the "in addition to" language of Article 581-33M.  Apprill's claim, thus, requires us to interpret the TSA.

We must construe the TSA so as to give effect to the intent of the enacting legislature.  <u>Union Bankers Ins. Co. v. Shelton</u>, 889 S.W.2d 278, 280 (Tex. 1994); <u>Sorokolit v. Rhodes</u>, 889 S.W.2d 239, 241 (Tex. 1994).  "Legislative intent can be inferred from the absence or presence of a particular provision in a statute."  <u>Green v. Watson</u>, 860 S.W.2d 238, 244 (Tex. App. - Austin 1993, n.w.h.) (citing <u>Morrison v. Chan</u>, 699 S.W.2d 205, 208 (Tex. 1985)).  Albeit the Texas legislature saw fit to expressly afford an aggrieved seller the right to seek compensatory damages, costs, and attorney's fees pursuant to his TSA claim, conspicuously absent from Article 581-33D's remedial scheme is a provision for the recovery of exemplary damages.  The legislature's express mention of one person, thing, consequence, or class is tantamount to the express exclusion of all others.  <u>Cole v. Huntsville Memorial Hosp.</u>, 920 S.W.2d 364, 372 (Tex. App. - Houston [1st Dist.] 1996, writ requested); <u>Lenhard v. Butler</u>, 745 S.W.2d 101, 105 (Tex. App. - Fort Worth 1988, writ denied).  We therefore cannot consider the Texas legislature's failure to include exemplary damages in the list of elements of relief for violations of the TSA to be a mere oversight.[16]

---

[16]That portions of the TSA were modeled after the Securities Act of 1933 and the Securities Exchange Act of 1934 is evident. <u>See</u> Tex. Rev. Civ. Stat. Ann. art. 581-33 (West Supp. 1996)

21

Also, Apprill's argument that the "in addition to" language of Article 581-33M creates a right to exemplary damages under the TSA is equally unavailing. The Commentary to Article 581-33 provides, with respect to Article 581-33M:

> The parenthetical reference to exemplary damages replaces--without substantive change--references at the end of old §§ 33A[17] and 33C to exemplary damages and art. 4004 (now Business & Commerce Code § 27.01). <u>Thus all common law and statutory liabilities outside the Texas Securities Act</u>, including § 27.01 (which permits triple damages in some instances), <u>remain intact and may be used along with the Texas and U.S. Securities Act liabilities</u>.

(Emphasis added). As these comments and Article 581-33M's heading

---

Comment-1977 Amendment, <u>prepared by</u> Committee on Securities and Investment Banking of the Section on Corporation, Banking and Business Law of the State Bar of Texas (hereinafter "Commentary"). Because of the obvious similarities between the TSA and the federal securities acts, Texas courts look to decisions of the federal courts to aid in the interpretation of the TSA. <u>See</u> <u>Searsy v. Commercial Trading Corp.</u>, 560 S.W.2d 637 (Tex. 1977); <u>Anheuser-Busch Cos. v. Summit Coffee Co.</u>, No. 05-92-00389-CV, 1996 WL 14061 at *6 (Tex. App. - Dallas Jan. 12, 1996, n.w.h.); <u>Campbell v. C.D. Payne & Geldermann Sec., Inc.</u>, 894 S.W.2d 411, 417 (Tex. App. - Amarillo 1995, writ denied); <u>Star Supply Co. v. Jones</u>, 665 S.W.2d 194, 196 (Tex. App. - San Antonio 1984, n.w.h.). Accordingly, it is persuasive that we have held exemplary damages are not recoverable under those provisions of the federal securities acts that correspond to Article 581-33. <u>See</u> <u>Jones v. Miles</u>, 656 F.2d 103, 108 n.8 (5th Cir. 1981); <u>Hill York Corp. v. American Int'l Franchises, Inc.</u>, 448 F.2d 680 (5th Cir. 1971).

[17]Apprill argues that, prior to the 1977 Amendment to the TSA, Article 581-33A(2) specifically provided for the recovery of exemplary damages upon proof that the misrepresentation was willfully made. Accordingly, Article 581-33M, after amendment, preserves that right of recovery. However, Apprill fails to acknowledge that the Comments to the 1963 Amendment which added the exemplary damages language to Article 581-33A(2) provide that this language was added to "emphasize the preservation of rights under Art. 4004," (now Bus. & Comm. Code Ann. § 27.01--statutory fraud). Thus, the purpose of this language was not to create a right to exemplary damages under the TSA, but to preserve that right under the statutory fraud cause of action in the Business and Commerce Code.

(i.e., "Saving of Existing Remedies") suggest, this provision merely confirms that other theories of liability that yield relief for the same transaction that gives rise to a cause of action under the TSA and that, unlike the TSA, allow recovery of exemplary damages are not preempted by the TSA.[18]  Consequently, Article 581-33M does not create a separate, affirmative right to exemplary damages on a cause of action under the TSA.

Apprill further contends that Chapter 41 of the Texas Civil Practice and Remedies Code, entitled "Exemplary Damages," creates a right to recover exemplary damages under the TSA.  See Tex. Civ. Prac. & Rem. Code Ann. § 41.001 et seq. (West Supp. 1996).  Section 41.002(a) states that Chapter 41 "applies to any action in which a claimant seeks exemplary damages relating to a cause of action."  Section 41.002(b) contains an exclusive list of actions to which Chapter 41 does not apply.  Apprill makes much of the fact that the

---

[18]We note that the Commentary with respect to Article 581-33D discussing the recovery of attorney's fees on a TSA claim states:

> New par.(7) allows a court to award attorneys fees to a successful plaintiff if the court finds that this would be equitable in the circumstances. . . . All the circumstances should be considered, e.g. the conduct of the defendant in the transaction (for example, fees are more appropriate against a fraudulent defendant than against a negligent or careful one), the conduct of the plaintiff in the transaction, the conduct of both parties in the lawsuit, whether the defendant benefited from the violation, and whether there was a special or fiduciary relationship between the plaintiff and defendant.  Recovery of exemplary damages for the same transaction, under common law or Business & Commerce Code § 27.01, should also be considered, since such damages serve in part to cover attorneys fees.

(Emphasis added).  This discussion further indicates the Committee did not contemplate that exemplary damages, along with attorneys fees, were recoverable under the TSA.

TSA is not excluded by § 41.002(b) and argues that the Texas legislature purposefully avoided expressly precluding recovery of exemplary damages under the TSA, thereby indicating its intent to afford such a remedy.

The better reading of Chapter 41, however, is that it merely sets standards for and limits upon an award of exemplary damages when the underlying cause of action subject to Chapter 41's terms makes recovery of such damages available. This view is buttressed by the Texas legislature's purpose for enacting Chapter 41. Facing increasing cost and unavailability of liability insurance as a result, in part, of a lack of predictability in the state's civil justice system, the Texas legislature enacted "tort reform measures," which included Chapter 41, aimed at restoring and maintaining reasonable predictability in the Texas system. See id. § 41.001 historical and statutory notes (referring to Tex. Civ. Prac. & Rem. Code Ann. § 9.001 historical and statutory notes (West Supp. 1996) for provisions of 1987 Act detailing legislative findings and purpose underlying enactment of Chapter 41). The provisions of Chapter 41, thus, were not intended to create new avenues for the recovery of exemplary damages, but to provide ascertainable standards for and reasonable limits upon the recovery of such damages under those causes of action already determined to support such claims.[19] In so doing, the legislature provided

---

[19]For example, § 41.002(b) provides: "This chapter establishes the maximum exemplary damages that may be awarded in an action subject to this chapter, including an action for which exemplary damages are awarded under another law of this state." Tex. Civ. Prac. & Rem. Code Ann. § 41.002(b) (West Supp. 1996). Likewise, §

liability insurers concrete guidelines by which they could evaluate the extent of their potential exposure, thereby making it more attractive to insurers to issue coverage in the state at affordable rates. Apprill's contention that Chapter 41 creates a right to exemplary damages on a TSA cause of action, thus, is incorrect.

Finally, we recognize that implicit in Apprill's argument is the contention that, even if exemplary damages are not an element of recovery for a violation of the TSA, Article 581-33M's saving language allows a TSA claimant to recover, in addition to the actual damages awarded on a TSA claim, exemplary damages awarded on any other claim on which the TSA claimant has received favorable findings and which supports such an award, like a § 27.01 or common-law fraud claim. In effect, Apprill wants to be able to piece together the most favorable portions of the jury's verdict to maximize his recovery. Recall, however, that under Texas law a party who submits numerous theories of liability to the jury, and who obtains findings of liability on two or more of those theories, is entitled to only a single recovery. <u>Boyce Iron Works, Inc.</u>, 747 S.W.2d at 787. If the party fails to elect prior to entry of judgment under which theory he wishes to recover, the trial court must enter judgment under the theory that affords the party the

---

41.003 is entitled "Standards for Recovery of Exemplary Damages," and states that "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from . . . (1) fraud; (2) malice; or (3) wilful act or omission or gross neglect in wrongful death actions." <u>Id</u>. § 41.003(a). Section 41.008 puts a cap on the amount of exemplary damages that may be awarded. <u>Id</u>. § 41.008.

25

greatest recovery.  <u>Birchfield</u>, 747 S.W.2d at 367.  Apprill's mix-and-match theory, then, creates a quandary of questions.[20]

Texas courts have yet to address this issue.  Our only guidance lies in dicta in <u>Holland v. Hayden</u>, 901 S.W.2d 763 (Tex. App. - Houston [14th Dist.] 1995, writ denied).  In a footnote, the court stated:

> We have neither been cited nor have we found a Texas opinion which directly addresses whether a plaintiff may pick and choose among damages elements arising under alternative theories of recovery.  However, current statements of Texas law and a federal opinion[, <u>Cryak v. Lemon</u>, 919 F.2d 320, 326 (5th Cir. 1990),] suggest not.

<u>Id</u>. at 767 n.8.[21]  Although dicta, we find this assessment by the

_____

[20]For example, when determining which theory provides the greatest recovery, does the trial court compare only the actual damages awards under each theory, leaving any exemplary damages award to be added to the largest actual damages award regardless of the theory that produces the exemplary damages award?  If so, what if the theory producing the largest actual damages award does not allow recovery of exemplary damages?  If, as in this case, only some of the theories upon which the party prevails afford for the recovery of exemplary damages, should the district court add the actual and exemplary damages awarded under those theories together and compare that total amount of damages to the actual damages amount awarded under the theories that do not allow for recovery of exemplary damages to determine the theory providing the greatest recovery?

[21]Our research also uncovered <u>Helm v. Landry Serv. Co.</u>, No. 01-94-00348-CV, 1995 WL 319014 (Tex. App. - Houston [1st Dist.] May 25, 1995, writ denied).  Although <u>Helm</u> was not designated for publication, and therefore under Tex. R. App. P. 90 the opinion may not be cited as authority, we find it instructive.  In <u>Helm</u>, the jury made the following awards to the plaintiff:

(1) for defendant's misappropriation of plaintiff's trade secret, actual damages of $1,017,000 and exemplary damages of $250,000;
(2) for defendant's unfair competition, actual damages of $404,806;
(3) for defendant's actual fraud, actual damages of $500,000 and exemplary damages of $400,000; and
(4) for defendant's constructive fraud, actual damages of

26

Texas Court of Appeals acutely persuasive, see, e.g., St. Paul Ins. Co. v. Rakkar, 838 S.W.2d 622 (Tex. App. - Dallas 1992, writ denied) (reforming judgment to award plaintiff actual and punitive damages on his breach of duty of good faith and fair dealing claim after concluding that trial court incorrectly trebled actual damages awarded on Insurance Code claim), and conclude that Apprill cannot cut and paste elements of relief arising from different theories of recovery. Thus, Apprill cannot tack any exemplary damages award based on his § 27.01 or common-law fraud theories onto his TSA actual damages award.

## C. Quest's breach of contract claim

### 1. Apprill's affirmative defenses

Apprill argues the district court, upon remand, erred by

---

$500,000 and exemplary damages of $400,000.

The judgment awarded the plaintiff actual damages of $1,017,000 under the misappropriation theory and exemplary damages of $400,000 under either the actual or constructive fraud theory.

In response to the defendant's complaint about the structure of the award, the court held:

> When a party tries a case on two or more alternative theories of recovery, and a jury returns favorable findings on two or more of the theories, the party has a right to judgment on the theory entitling it to the greatest relief. We are not aware of any authority, and [plaintiff] cites none, giving a prevailing party the right to choose an actual damage award under one theory and an exemplary damage award under another theory. Rather, as in Boyce Iron Works and its progeny, the prevailing party is entitled to judgment on the single theory under which it recovered the greatest relief. Here, that theory is misappropriation of a trade secret.

Id. at *5 (citations omitted). Accordingly, the court reformed the judgment to award the plaintiff $1,017,000 of actual damages and $250,000 of exemplary damages.

27

entering judgment for Quest on its breach of contract claim without addressing his affirmative defenses under Rule 10b-5 and the TSA. In the first appeal, however, a panel of this court affirmed Quest's breach of contract claim, stating: "On the facts of this case, Apprill ratified the Stock Purchase Agreement as a matter of law and was barred from asserting his mistake and fraud defenses to the contract." Quest Medical, Inc. v. Apprill, No. 92-1067, slip op. at 8 (5th Cir. July 16, 1993). In a footnote, the panel further concluded that Apprill voluntarily withdrew his TSA affirmative defense at the first trial and that any claim to the contrary was not preserved for appeal. Id., slip op. at 9 n.4.

The law of the case doctrine precludes reexamination of issues decided on appeal, either by the district court on remand or by the appellate court itself upon a subsequent appeal. Conway v. Chemical Leaman Tank Lines, Inc., 644 F.2d 1059, 1061 (5th Cir. 1981). This rule applies whether the issue was decided expressly or necessarily by implication. Id. The law of the case doctrine, however, is not inviolable; an appellate court decision is to be followed in all subsequent proceedings in the same case unless evidence in the subsequent trial is substantially different, the prior decision was clearly erroneous and would work manifest injustice, or controlling authority has in the interim made a contrary rule of law applicable. Illinois Cent. Gulf R.R. Co. v. International Paper Co., 889 F.2d 536, 539 (5th Cir. 1989).

The earlier panel of this court sustained Quest's breach of contract claim and rejected Apprill's affirmative defenses. It

28

remanded only the question of the amount of damages for the breach. The district court granted summary judgment on the damages issue, rejecting Apprill's asserted defenses under the law of the case doctrine. The district court properly invoked the doctrine.

### 2. *Prejudgment interest rate*

The district court awarded Quest prejudgment interest on its breach of contract damages at a rate of 10% per annum, compounded daily. Apprill argues the appropriate rate is 6% simple interest.

State law governs the award of prejudgment interest. <u>FSLIC v. Texas Real Estate Counselors, Inc.</u>, 955 F.2d 261, 270 (5th Cir. 1992). Under Texas law, prejudgment interest may be awarded under either contractual or equitable theories. <u>Perry Roofing Co. v. Olcott</u>, 744 S.W.2d 929, 930 (Tex. 1988). Judgments based on contracts earn interest at the rate specified in the contract. Tex. Rev. Civ. Stat. Ann. art. 5069-1.05 § 1(1) (West Supp. 1996). If the contract specifies no rate of interest, "interest at the rate of six percent per annum shall be allowed on all . . . contracts ascertaining the sum payable." Tex. Rev. Civ. Stat. Ann. art. 5069-1.03 (West 1987). If the sum payable is not ascertainable from the contract, prejudgment interest may be appropriate in equity, the rate being that specified in Tex. Rev. Civ. Stat. Ann. art. 5069-1.05 (West Supp. 1996).[22] <u>Perry Roofing Co.</u>, 744 S.W.2d

---

[22]Article 5069-1.05 provides, in relevant part:

Sec. 2. Except as provided Section 1 of this article, all judgments, together with taxable court costs, of the courts of this state earn interest, compounded annually, at the rate published by the consumer credit commissioner in the Texas Register. The consumer credit commissioner shall compute on the

at 930.  See also Axelson, Inc. v. McEvoy-Willis, 7 F.3d 1230, 1234 (5th Cir. 1993).

Apprill admits the Agreement did not specify any rate of interest, but argues the sum payable for breach of the contract was reasonably ascertainable from the contract in light of the circumstances, such that Article 5069-1.03's 6% rate applies. Quest contends the agreement is silent on the measure of damages, thus a 10% rate is proper.  Whether the Agreement is a contract "ascertaining the sum payable" within the meaning of Article 5069-1.03 is controlling.

The requirement that the contract set out a sum payable is liberally construed.  La Sara Grain Co. v. First Nat'l Bank of Mercedes, 673 S.W.2d 558, 567 (Tex. 1984).  In fact, "[i]t is sufficient . . . if the contract provides the conditions upon which liability depends and fixes a measure by which the sum payable can be ascertained with reasonable certainty, in the light of the attending circumstances."  Id. (quoting Federal Life Ins. Co. v. Kriton, 249 S.W. 193, 195 (Tex. 1923)).  However, "[i]f the contract does not 'unambiguously[] establish the amount owed,' article 5069-1.05 applies."  Axelson, Inc., 7 F.3d at 1234. Review of the method by which the district court arrived at the breach of contract damages amount reveals that the measure of damages was not

_____

15th day of each month the judgment interest rate . . . . The interest rate so computed shall be the judgment rate, except that if the rate so computed is less than 10 percent, the judgment interest rate shall be 10 percent . . . .

Tex. Rev. Civ. Stat. Ann. art 5069-1.05 § 2 (West Supp. 1996).

discernable from the face of the Agreement.[23]  Thus, the district court correctly awarded Quest prejudgment interest at 10% per annum, compounded daily.  Lafarge Corp. v. Hartford Casualty Ins. Co., 61 F.3d 389, 401-02 (5th Cir. 1995); Axelson, Inc., 7 F.3d at 1234.

### III.  CONCLUSION

Based on the foregoing discussion, we conclude that the district court properly granted judgment notwithstanding the verdict and only awarding Apprill $101,027 in actual damages on his TSA cause of action, and thus its judgment is AFFIRMED.

---

[23]The parties stipulated to the amount of Quest's breach of contract damages, which Quest calculated as:

(1)  As of August 29, 1989, Apprill had 16,600 shares of Hemotec, Inc. ("Hemotec") stock which he had sold to Quest under the Stock Purchase Agreement but had not yet tendered.
(2)  On that date, one share of Hemotec was convertible into .61 shares of Bio-Medicus stock, so that the 16,600 shares of Hemotec were convertible into 10,126 shares of Bio-Medicus.
(3)  Also on August 29, 1989, Bio-Medicus shares were trading at $18.00 per share.  Therefore, the value of Apprill's remaining Hemotec shares was $182,268.00.
(4)  Quest was obligated to pay Apprill $76,775.00 for his remaining Hemotec shares under the Stock Purchase Agreement.
(5)  Thus, Quest's damages due to Apprill's failure to deliver the remaining shares on August 29, 1989 are $105,493.00, the difference between the market value of the shares on that date and the amount Quest was obligated to pay for them.

The district court adopted this computation.

31