J. Mark SWINNEA, Brady Environmental, Inc. and Malmeba Company, Ltd., Appellants

v.

ERI CONSULTING ENGINEERS, INC. and Larry G. Snodgrass, Appellees.

No. 12–05–00428–CV.

Court of Appeals of Texas, Tyler.

Aug. 30, 2007.

Rehearing Overruled Nov. 19, 2007.

Gregory D. Smith, Sheral K. Maloy, for appellants.

Deborah J. Race, Roger W. Anderson, Tyler, for appellees.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## OPINION

SAM GRIFFITH, Justice.

Mark Swinnea, Brady Environmental, Inc., and Malmeba Company, Ltd. appeal from an adverse judgment entered after a bench trial in a suit brought by ERI Consulting Engineers, Inc. (ERI) and Larry G. Snodgrass for fraud, breach of contract, breach of fiduciary duty, and conspiracy. Appellants attack the sufficiency· of the

evidence to support the damage awards, the trial court's determination that Snodgrass has standing to recover, the finding of Brady's liability, the viability and amount of the punitive damage award, and the failure to find that ERI is liable for unpaid rentals on the building lease. We affirm in part and, because the evidence is legally insufficient to support the damage awards, we reverse and render in part.

## BACKGROUND

Beginning in 1992, Larry Snodgrass and Mark Swinnea co-owned ERI, an environmental engineering company. Much of their work involved consulting on asbestos abatement projects. They were also partners in a limited partnership called Malmeba, which owned the building that ERI leased. On August 31, 2001, Snodgrass bought out Swinnea's interest in ERI. The document memorializing the buyout is entitled "Stock Redemption Agreement." By virtue of this agreement, ERI repurchased Swinnea's five thousand shares of capital stock in ERI for three named items of consideration: $497,500.00 cash paid to Swinnea, transfer to Swinnea of Snodgrass's ownership interest in Malmeba, and the right for ERI to purchase certain equipment from Malmeba. At the same time, the parties signed an employment contract by which Swinnea agreed to work for ERI for six years. The contract included a noncompete agreement in effect for the six year term of the employment contract. Additionally, ERI entered a lease agreement with Malmeba to lease the land and building housing ERI for a period of six years.

In the summer of 2001, before the buyout of ERI, Swinnea and Chris Power, another ERI employee, formed a new company called Air Quality Associates, Inc. (AQA). AQA, an abatement contractor, began bidding on ERI administered asbestos abatement projects. Snodgrass was unaware that Swinnea and Power owned AQA until Jeff Shannon of Merico Abatement told him. Merico, also an abatement contractor, was one of ERI's biggest clients but stopped bidding on ERI projects when Snodgrass refused Merico's request for ERI to stop accepting bids from AQA. In February 2002, Power bought Swinnea's interest in AQA.

In August 2002, about a year after the buyout of Swinnea's ERI stock, Swinnea's wife, Dawn, started a new abatement contracting company, Brady Environmental, Inc. Swinnea continued to be employed by ERI until June 2004, when he was terminated. ERI and Snodgrass filed suit against Swinnea and Brady on August 5, 2004, alleging common law fraud, fraud in a stock transaction, breach of contract, breach of fiduciary duty, and conspiracy. Swinnea and Brady counterclaimed for breach of contract and conspiracy. Malmeba filed a third party complaint against ERI and Snodgrass for anticipatory breach of the lease agreement. ERI moved out of the Malmeba building September 30, 2004. In August 2005, ERI and Snodgrass amended their petition to add a cause of action for breach of the duty of good faith and fair dealing.

The case was tried to the bench. Among many other findings, the trial court found that Swinnea breached his fiduciary duty to Snodgrass and ERI, committed fraud in the context of the buyout, made false representations of past and existing material facts to induce Snodgrass and ERI to enter into the buyout, made false promises regarding his performance to induce Snodgrass and ERI to enter into the transaction, and engaged in a conspiracy with Brady. The court also found that Swinnea must forfeit "unjust profits and gains" he obtained as a result of his wrongful conduct. Therefore, the court

found that ERI and Snodgrass were entitled to recover $133,200.00 for the lease payments of $3,600.00 per month from September 1, 2001 through September 30, 2004; $437,500.00, a portion of the up front cash paid in the buyout; $150,000.00 for one half the value of Malmeba; and $300,000.00 for the loss of income from ERI's business relationship with Merico. The trial court ordered that ERI and Snodgrass recover those amounts from Swinnea and Brady as actual damages totaling $1,020,700.00, that Swinnea pay Snodgrass $1,000,000.00 in exemplary damages, and that Snodgrass and ERI recover attorneys' fees. The court ordered that Swinnea, Brady, and Malmeba take nothing on their claims against Appellees.

### JURISDICTION

In their second issue, Appellants assert that there is no evidence that Snodgrass, rather than ERI, paid any portion of the cash Swinnea received in the buyout or that Snodgrass had standing to recover the purchase money. They further argue that Snodgrass did not have standing individually to recover any loss of Merico income and any such award would belong solely to ERI. As the issue of standing is jurisdictional, we will address this issue out of order.

■■■ A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority. *See Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). A party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy. *Id.* Standing is jurisdictional and can be raised for the first time on appeal. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex.1993). Capacity is not jurisdictional

and may be waived. *See Nootsie*, 925 S.W.2d at 662.

■■■ The gist of Appellants' argument is that, because the transaction at issue was the repurchase by ERI of its own stock, and Snodgrass individually was not a party to the transaction, he cannot be entitled to win damages individually. This argument raises the issue of capacity, not standing. *See Murphy v. American Rice, Inc.*, No. 01–03–01357–CV, 2007 WL 766016, at *13, 2007 Tex.App. LEXIS 2031, at *44 (Tex. App.-Houston [1st Dist.] March 9, 2007, no pet.); *Mackie v. Guthrie*, 78 S.W.3d 462, 465–66 (Tex.App.-Tyler 2001, pet. denied). Rule of civil procedure 93(2) requires a party complaining that a plaintiff is not entitled to recover in the capacity in which he sues to raise the issue at trial by filing a sworn affidavit. TEX.R. CIV. P. 93(2). Failure to comply with Rule 93 results in waiver of the right to complain on appeal about the plaintiff's capacity. *Nootsie*, 925 S.W.2d at 662. Appellants' answer does not raise the issue of capacity, nor is it verified by affidavit. Appellants have waived the right to raise the issue of Snodgrass's capacity. We overrule Appellants' second issue.

### STANDARD OF REVIEW

■■■ Findings of fact entered in a case tried to the court are of the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing the legal and factual sufficiency of the evidence supporting a jury's answer to a jury question. *Id.* Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence; they will not be reversed

unless they are erroneous as a matter of law. *Texas Dep't of Pub. Safety v. Stockton,* 53 S.W.3d 421, 423 (Tex.App.-San Antonio 2001, pet. denied).

If an appellant is attacking the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. *See Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). The reviewing court views the evidence in the light most favorable to the verdict, indulging every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). The reviewing court must credit evidence that supports the verdict if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 827. We must determine whether the evidence at trial would enable a reasonable and fair minded person to find the facts at issue. *Id.* A legal sufficiency challenge may be sustained only when 1) the record discloses a complete absence of evidence of a vital fact; 2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; 3) the evidence offered to prove a vital fact is no more than a mere scintilla; or 4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex. 1998).

### SUFFICIENCY OF THE EVIDENCE OF ACTUAL DAMAGES

In their first issue, Appellants contend there is no evidence or factually insufficient evidence to support the awards of actual damages. They assert that Appellees did not prove the value of ERI or the redeemed shares. They argue that Appellees failed to present evidence that Appel-

lants' actions contributed to causing an identifiable loss or improper gain. Appellants further assert that the evidence of lost Merico income is speculative.

The trial court found Appellants liable for four separate categories of actual damages: $133,200.00 for lease payments of $3,600.00 per month from September 1, 2001 to September 30, 2004; $437,500.00, a portion of the up front cash paid in the buyout; $150,000.00 for one half the value of Malmeba; and $300,000.00 for loss of income from the business relationship with Merico. We must consider whether the evidence and the law support any of the four categories.

### *Lease Payments*

On August 31, 2001, the same day the buyout agreement was executed, Malmeba and ERI entered into a lease agreement. The agreement provided that ERI would lease the land and building at 2024 Republic Drive for six years, beginning September 1, 2001. The rental rate was to be $3,600.00 per month for three years and then $3,800.00 per month for the next three years. Snodgrass personally guaranteed payment of ERI's obligations to Malmeba under the lease agreement. ERI moved out of the Malmeba building on September 30, 2004 and made no rental payments after that date. Because of Swinnea's wrongful conduct, the trial court awarded ERI and Snodgrass $133,200.00 for the $3,600.00 monthly payments made to Malmeba from September 1, 2001 to September 30, 2004.

Snodgrass testified that he and Swinnea had an oral agreement by which they understood that the rent was basically another way to compensate Swinnea. When testifying, Swinnea answered affirmatively when Appellees' attorney asked if the lease payments were part of the consideration for the buyout. However, the "Stock Redemption Agreement" listed the "total con-

sideration" for the purchase of Swinnea's stock and includes no reference to lease payments for the use of the Malmeba building.

■■■■ The parol evidence rule prohibits the admission of extrinsic evidence to vary or explain the terms or contradict the legal effect of an unambiguous written instrument in the absence of a showing of fraud, accident, or mistake in its preparation. *Johnson v. Driver*, 198 S.W.3d 359, 363 (Tex.App.-Tyler 2006, no pet.). In some instances, parol evidence is admissible to contradict a recital of consideration in a written instrument. *See Jackson v. Hernandez*, 155 Tex. 249, 251, 285 S.W.2d 184, 185 (1955). However, when the consideration expressed in a writing is contractual in nature, and is not simply a recital of consideration already performed, the parol evidence rule applies. *Lakeway Co. v. Leon Howard, Inc.*, 585 S.W.2d 660, 662 (Tex.1979). A previous or simultaneous agreement to alter the fee agreed upon in a written contract is in conflict with the written contract and not merely collateral to it. *Id.* The parol evidence rule is a rule of substantive law, and testimony admitted in violation of that rule cannot be considered, even when it is admitted without objection. *Hubacek v. Ennis State Bank*, 159 Tex. 166, 169, 317 S.W.2d 30, 32 (1958); *Wilkins v. Bain*, 615 S.W.2d 314, 315 (Tex.Civ.App.-Dallas 1981, no writ). Thus, evidence admitted in violation of the parol evidence rule cannot avoid or change the tenor of the written instrument, nor will it support a finding of fact by the trial court. *Foster v. Wagner*, 337 S.W.2d 485, 492 (Tex.Civ.App.-El Paso 1960), *rev'd on other grounds*, 161 Tex. 333, 341 S.W.2d 887 (1960). Further, it cannot be made the basis of a finding of fact by an appellate court, nor considered by such court in determining the sufficien-cy of the evidence to support the judgment. *Id.*

Here, the Stock Redemption Agreement unambiguously set out the total consideration due to ERI to repurchase Swinnea's stock. The testimony characterizing the Malmeba lease as additional consideration for the buyout is incompetent parol evidence that cannot support the trial court's damage finding. *See Hubacek*, 159 Tex. at 169, 317 S.W.2d at 32. Accordingly, the trial court erred in awarding Snodgrass and ERI $133,200.00 to reimburse them for payments made to rent the Malmeba building from September 1, 2001 to September 30, 2004.

### Up Front Cash, Credit for Value of Malmeba, and Loss of Income from Merico

By the terms of the Stock Redemption Agreement, Swinnea received $497,500.00 in cash and Snodgrass's ownership interest in Malmeba, the monetary value of which was not stated. The trial court awarded Snodgrass $437,500.00 as a portion of the up front cash paid and $150,000.00 representing the trial court's determination of one half the value of Malmeba. Additionally, as a separate actual damage award, the trial court ordered Appellants to pay $300,000.00 for the loss of income from ERI's business relationship with Merico. Applying the appropriate measure of damages, we must consider whether the evidence supports these awards.

### Common Law and Statutory Fraud

■■■■ The trial court found Appellants liable for both common law fraud and statutory fraud, which involves a false representation in a stock transaction. *See* TEX. BUS. & COM.CODE ANN. § 27.01(a) (Vernon 2002). The statute allows recovery for actual damages, but does not define actual damages. TEX. BUS. & COM.CODE ANN. § 27.01(b) (Vernon 2002). In the absence of a statutory definition, Texas courts gen-

erally look to the common law for guidance. *See Quest Med., Inc. v. Apprill*, 90 F.3d 1080, 1084 n. 4 (5th Cir.1996). The measure of damages recoverable under Section 27.01 is the same as that under a claim of common law fraud. *Id.*

Under common law, there are two measures of damages for fraud, the out of pocket measure, which is the difference between the value paid and the value received, and the benefit of the bargain measure, which is the difference between the value as represented and the value actually received. *W.O. Bankston Nissan, Inc. v. Walters*, 754 S.W.2d 127, 128 (Tex. 1988). Both measures of damages are determined at the time of the sale. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex.1997). The "value received" is determined by evidence of fair market value. *Sobel v. Jenkins*, 477 S.W.2d 863, 868 (Tex.1972); *Morriss–Buick Co. v. Pondrom*, 131 Tex. 98, 100–01, 113 S.W.2d 889, 890 (1938); *Broady v. Mitchell*, 572 S.W.2d 36, 42 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.). The contract price is at least some evidence of market value. *Jack Roach Ford v. De Urdanavia*, 659 S.W.2d 725, 729 (Tex.App.-Houston [14th Dist.] 1983, no writ).

### Evidence of Damages

In his initial proposal, Snodgrass valued ERI at $1,500,000.00. He valued Malmeba at $300,000.00 based on the monthly rental rate charged. Appellants presented no evidence disputing Snodgrass's initial valuations. Snodgrass testified that "what [he] ended up buying was a pig in a poke." He said the buyout was not a fair deal because Swinnea did not give one hundred percent after the buyout and he got "very little, if any, value out of the consideration [he] gave to Mr. Swinnea." When asked how ERI was damaged, he explained that it

was damaged because he relied on Swinnea to provide additional revenue, which he did not provide. Snodgrass expected Swinnea to bring in as much or more income as he had before the buyout.

The record includes ERI's financial statements for years 2001 through 2004. Total revenue for ERI's engineering department in 2001 was $1,299,561.43. After expenses, the net income for the engineering department in 2001 was $14,112.51. Net income for the entire company in 2001, including all offices, was $42,948.38. Total revenue for the engineering department in 2002 was $1,263,149.91, but it logged in a loss of $416,461.20 that year, in large part due to abandoned equipment. Salaries were 44.15 % of total operating expenses in 2001, but 73.35 % in 2002. In addition to salaries, other operating expenses that were higher in 2002 included business meals, subscriptions, the employee Christmas party, entertainment, expense allowances, and travel. Accompanying the financial statements for years 2001 through 2003 is a letter from the accounting firm that compiled the statements explaining that the compilation is limited to presenting information that is the "representation of management." The letter further states as follows:

> Management has elected to omit substantially all of the disclosures ordinarily included in financial statements and supplementary schedules prepared on the income tax basis of accounting. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the Company's assets, liabilities, equity, revenues, and expenses. Accordingly, these financial statements are not designed for those who are not informed about such matters.

The financial statements do not reflect ERI's liability, equity, value, revenue, ex-

penses, profits, or losses for August 31, 2001, the day Snodgrass bought Swinnea's half of ERI. While the financial statements paint a picture, they do not provide the information necessary for determining the value of ERI.

Larry Boyd, ERI's controller since September 1, 2001, testified that just after the buyout, the company had a negative balance of $42,000.00 and was $83,000.00 in arrears. He did not, however, consider outstanding accounts receivables in arriving at those figures. Boyd did not testify as to the value of ERI at the time of the buyout.

Keith Stiefel, the accountant whose firm prepared most of the financial statements in evidence, testified that, at the time of the buyout, he felt Snodgrass paid "a good price" for the company. He also answered affirmatively when asked if, considering ERI's financial records from the four years after the buyout, he thought the price paid would be a fair price today. Steifel, however, did not testify as to the value of ERI at the time of the buyout.

■■■ One aspect of valuation is the goodwill of the business. Goodwill, though intangible, is an integral part of a business. *Texas & Pac. Ry. Co. v. Mercer*, 127 Tex. 220, 226, 90 S.W.2d 557, 560 (1936). As property, it may be sold and it may be damaged. *Id.*, 127 Tex. at 225, 90 S.W.2d at 560. The rule for measuring such damages is the same as that for measuring damages to any other property. *Id.*, 127 Tex. at 226, 90 S.W.2d at 560. Goodwill is generally understood to mean the advantages that accrue to a business on account of its name, location, reputation, and success. *Taormina v. Culicchia*, 355 S.W.2d 569, 574 (Tex.Civ.App.-El Paso 1962, writ ref'd n.r.e.). The value of the goodwill of a business depends upon the fixed and favorable consideration of customers arising from an established, well known, and well conducted business. *Id.*

■■■ Here, the testimony showed that ERI is a service business and its success depended on the strength of Swinnea, Power, and Snodgrass. Swinnea testified that the value of ERI was in part the expertise of the principals, client contacts, and goodwill. A distinction can be drawn between the goodwill that attaches to a professional person because of confidence in the skill and ability of the individual and the goodwill of a trade or business that arises from its location or its well established and well recognized name. *Salinas v. Rafati*, 948 S.W.2d 286, 290 (Tex.1997). However, the record before us contains no evidence specifying the value of ERI's goodwill or the extent to which it was damaged by Swinnea's actions.

### Out of Pocket Measure

■■■ The out of pocket measure of damages requires us to consider the difference between the value paid and the value received. *See Walters*, 754 S.W.2d at 128. The out of pocket measure compensates only for actual injuries a party sustains through parting with something, not loss of profits not yet realized. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998). Therefore, Appellees cannot recover for loss of income from ERI's business relationship with Merico under the out of pocket measure of damages. Snodgrass testified that ERI, at the time of trial, was worth what he bought it for. He did not, nor did anyone else, testify to the value of ERI or its stock at the time of the buyout. While the record contains financial information, it does not contain testimony or documentation showing the value of ERI, the value of ERI stock, or the value of Malmeba. The record does not show what, if any, difference there is between

the consideration ERI paid to repurchase Swinnea's stock, namely the cash and one half interest in Malmeba as specified in the Stock Redemption Agreement, and the value ERI received. Therefore, under the out of pocket measure, there is no evidence of any actual damages due ERI and Snodgrass arising from the buyout. *See Wilson*, 168 S.W.3d at 827.

### Benefit of the Bargain Measure

■■■■■ The benefit of the bargain measure requires us to consider the difference between the value as represented and the value received. *See Walters*, 754 S.W.2d at 128. Consequential damages may be recoverable if it is shown they are the foreseeable result of the wrong and directly traceable to it. *Arthur Andersen*, 945 S.W.2d at 816. Consequential damages could include foreseeable profits from other business opportunities lost as a result of the fraudulent misrepresentation or nondisclosure. *Formosa Plastics*, 960 S.W.2d at 49 n. 1. Under the benefit of the bargain measure, lost profits that would have been made if the bargain had been performed as promised may be recovered if proven with reasonable certainty. *Id.* at 50. Lost profits are measured by comparing the anticipated profits under the fraudulently promised bargain with profits actually received. *Id.* Determining whether lost profits have been proved with reasonable certainty is a fact intensive determination dependent upon the circumstances of a particular case. *Id.* at 50 n. 3.

■■■■■ Opinions or lost profit estimates must be based on objective facts, figures, or data from which the lost profits amount may be ascertained. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994). When a review of the surrounding circumstances establishes that the profits are not reasonably certain, or lost profit calculations are predicated on

unfounded, speculative assumptions, there is no evidence to support the lost profits award. *Formosa Plastics*, 960 S.W.2d at 50 n. 3; *Capital Metro. Transp. Auth. v. Central of Tenn. Ry. & Navigation Co.*, 114 S.W.3d 573, 579–82 (Tex.App.-Austin 2003, pet. denied). Anticipated profits cannot be recovered where they are largely speculative, such as when they are dependent upon uncertain and changing conditions, including market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated. *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex.1994).

Snodgrass considers ERI worth what he paid for it but expected the company to make more money. He specifically complained of the damage to expected Merico income and alleged that Swinnea did not bring in as much business as Snodgrass had expected. In applying the benefit of the bargain measure, keeping in mind that there can be no recovery for damages which are speculative or conjectural, we look to the evidence of reasonably certain lost profits to determine what the value of ERI was on the day of the buyout considering anticipated profits and business opportunities. *See Apprill*, 90 F.3d at 1088–89.

Power testified that the loss of Merico resulted in a loss to ERI of $300,000.00 or $400,000.00 worth of air monitoring business a year. Appellees presented all invoices for Merico work from January 2000 to May 2004. Accounts receivables for Merico from January 2000 until August 2001 had a monthly average of $19,833.10. Accounts receivables for Merico from September 2001 until May 2004 had a monthly average of $1,792.59. Appellees subtracted the post-buyout accounts receivables from the pre-buyout accounts receivables to determine a "monthly loss" and then

multiplied that by thirty-three months, claiming a total loss of invoicing revenue of $595,336.83.

When questioned, Snodgrass admitted this number was based on the total amount billed to Merico and did not signify a claim of lost profits in that amount. The benefit of the bargain measure considers anticipated lost profits, not anticipated lost accounts receivable. *See Formosa Plastics*, 960 S.W.2d at 50. The calculation of lost profit damages must be based on net profits, not gross revenue or gross profits. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 n. 1 (Tex.1992); *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex.App.-Dallas 1988), *writ denied per curiam*, 778 S.W.2d 865 (Tex.1989). When asked what ERI's usual profit margin is, Snodgrass explained that a "net number is probably somewhere in the seventy to eighty percent range." He further explained that "a net, net number probably gets us down to somewhere around 30 to 25 percent." Lost profits can be proven through personal knowledge of the witness. *See White v. Sw. Bell Tel. Co.*, 651 S.W.2d 260, 262–63 (Tex.1983). However, thirty percent of $595,336.83 is $178,601.04, which is nowhere near the $300,000.00 awarded by the court for the "loss of income from their business relationship with Merico." It does not appear the trial court based the award on Snodgrass's testimony.

Swinnea explained that the Merico/ERI relationship was dual in nature. As a consultant, ERI invited abatement contractors, including Merico, to bid on its clients' jobs. Additionally, on jobs where Merico was involved as a contractor, it would invite ERI to bid on the air monitoring aspect of the job. He also explained that, while Merico and ERI had an established working relationship, the Merico work was not primarily high profit. By not doing Merico work, ERI was able to do high profit mold work.

Power testified that he thought that, in the long term, the loss of Merico would not be "the driving force of ERI for the future" because ERI and AQA were focused on taking care of their clients. He said he has worked hard to try to replace the lost Merico work. However, because Snodgrass does not discuss the dollar amounts of ERI's profits with him, he does not know if he has made up for those losses.

Jeff Shannon, project manager for Merico Abatement Contractors, testified about Merico's relationship with ERI. He explained that, for years, they referred work to each other. If Merico needed air monitoring, he gave the job to ERI. But, if ERI did not quote them a good price on the job, Merico did not use them. At one time, Merico got twenty or twenty-five percent of ERI's work. At the time AQA came into existence, Merico was the only such business in this area. After he learned that ERI employees were involved with AQA, Merico's competitor, he "gave Snodgrass the opportunity to keep [their] relationship going" by refusing to allow AQA to bid on ERI's asbestos projects. Snodgrass declined to stop working with AQA, but about a year later, Swinnea started inviting Merico to bid on jobs again. By the time of trial, Merico had started bidding on projects that AQA also bid on. He testified that Merico had recently gotten ten percent of the work they bid on for ERI. Merico also has a working relationship with three other consulting companies. Shannon also stated that he has done asbestos work for twenty years and the work had steadily decreased.

While it is appropriate to consider the amount of profit ERI derived from its past work with Merico, we must also consider the surrounding circumstances. *See Texas Instruments*, 877 S.W.2d at 279. Merico's

main work was asbestos abatement. It is undisputed that this type of work was decreasing. Shannon testified, "[W]e're all working ourselves out of a job. There won't be any asbestos." During the time frame at issue, while ERI did less of this type of work with Merico, it did more with AQA. There is a finite number of asbestos laden buildings and their owners can call either AQA or Merico or other such companies. There is no evidence of any particular jobs ERI would have done with Merico but that it did not do because of any act by Swinnea. Furthermore, Shannon testified that Merico could reject an ERI bid if it did not give Merico a good price. Eventually, AQA and Merico were both bidding on work with ERI. This laudable application of the free enterprise system contributes further to the speculative nature of ERI's claim of lost profits.

ERI did not present evidence of net profits. *See Holt Atherton,* 835 S.W.2d at 83 n. 1. Further, ERI assumed it would enjoy exactly the same amount of work with Merico after the buyout as it did before the buyout. To make that assumption, it had to assume that all other factors, market, personalities, and otherwise, would remain the same. These assumptions were made in the face of evidence that the business of asbestos remediation was in a constant state of decline. ERI's anticipated profits are therefore largely speculative. *See Texas Instruments,* 877 S.W.2d at 279. ERI's lost profit calculations are no evidence of lost profits because they are predicated on unfounded, speculative assumptions. *See Capital Metro. Transp. Auth.,* 114 S.W.3d at 580–81; *SBC Operations, Inc. v. Business Equation, Inc.,* 75 S.W.3d 462, 469 (Tex.App.-San Antonio 2001, pet. denied). It has not been shown that a loss of profits is the natural and probable consequence of Swinnea's wrongful conduct. *See Texas Instruments,* 877 S.W.2d at 279. Therefore, the trial court erred in awarding Appellees $300,000.00 for loss of income from the business relationship with Merico. *See Szczepanik,* 883 S.W.2d at 650. Moreover, if Appellees had proven lost Merico profits, that amount should have been incorporated into the benefit of the bargain equation to determine damages. It would not constitute a separate award.

Further, while Snodgrass testified that he expected Swinnea to contribute more and provide additional income which he did not provide, this testimony is merely a reference to speculation. While ERI presented testimony that Swinnea caused it to lose business and that Swinnea did not bring in as much business as Snodgrass expected, it did not present specific evidence directly linking Swinnea's wrongful acts to specific lost revenue. *See Arthur Andersen,* 945 S.W.2d at 816. Therefore, there is no evidence of any foreseeable profits from other business opportunities lost as a result of Swinnea's actions. *See Formosa Plastics,* 960 S.W.2d at 49 n. 1. Further, Appellees did not establish how much of that loss, if any, constitutes loss of value of the business occurring at the time of the sale and how much, if any, was attributable to Swinnea's later breach of the employment contract. *See Arthur Andersen,* 945 S.W.2d at 817.

Returning to our formula for benefit of the bargain damages, we are to determine the difference between the value of ERI as represented and the value received. The value of ERI as represented is what ERI paid to repurchase Swinnea's stock in ERI. The amount of reasonably certain lost profits proven by Appellees is zero. *See Formosa Plastics,* 960 S.W.2d at 50. In the absence of lost profits, there is no evidence that the value received is any different from the value as represented. Thus, Appellees did not prove any actual

damages under the benefit of the bargain measure of damages. *See id.*

### Breach of Fiduciary Duty/Disgorgement

The trial court awarded ERI the sums of $437,500.00, $150,000.00, and $133,200.00 in part as "forfeiture of unjust profits and gains which J. Mark Swinnea obtained as a result of [his] wrongful conduct." Appellants contend that the trial court misapplied the rule for disgorging windfalls. They argue that there is no evidence that Swinnea profited beyond what would have been expected at the time of the transaction or that any profit was made illicitly at ERI's expense. Further, they assert that the rule regarding disgorgement contemplates prevention of unjust enrichment by forcing the return of improper gain, not the entire consideration received.

■ Appellees respond that the trial court was justified in ordering the return of any profits, proceeds, and benefits received as a result of Swinnea's breach of fiduciary duty. They argue in favor of the "equitable remedy of forfeiture or disgorgement," citing a variety of cases including legal malpractice fee forfeiture cases. We acknowledge that fees collected by a fiduciary may be forfeited as a result of a breach of fiduciary duty. *See, e.g.,* TEX. PROP.CODE ANN. § 114.008(a)(8) (Vernon 2007) (court may reduce or deny compensation to trustee to remedy a breach of trust); *Burrow v. Arce,* 997 S.W.2d 229, 246 (Tex.1999) (Upon breach of fiduciary duty by attorney, forfeiture of attorney's compensation may be necessary to satisfy the public's interest in protecting the attorney-client relationship.). However, to the extent Appellees assert that the trial court's awards are valid based on the equitable remedy of fee forfeiture, we disagree. Here, there is no such fee involved and therefore that line of cases is inapposite.

■ A plaintiff may be awarded its actual damages for breach of fiduciary duty. *See Duncan v. Lichtenberger,* 671 S.W.2d 948, 953 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.). In addition to out of pocket damages, a plaintiff may recover lost profits for a breach of fiduciary duty if proven with reasonable certainty. *Carr v. Weiss,* 984 S.W.2d 753, 769 (Tex.App.-Amarillo 1999, pet. denied). Further, a plaintiff may be entitled to equitable relief and the trial court has discretion to apply an appropriate equitable remedy. *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 576-77 (Tex.1963). For instance, disgorgement is an equitable remedy by which the wrongdoer is divested of ill gotten gains. *Securities & Exch. Comm'n v. Huffman,* 996 F.2d 800, 802 (5th Cir.1993). Thus, a fiduciary must account for, and yield to the beneficiary, any profit he makes as a result of his breach of fiduciary duty. *Holloway,* 368 S.W.2d at 576-77.

As explained above, Appellees did not prove any actual damages or reasonably certain lost profits. Neither did Appellees prove that Swinnea obtained any ill gotten gains at ERI's expense. Therefore, there is no evidence to support an award of damages for breach of fiduciary duty, equitable or otherwise. *See Martinez,* 977 S.W.2d at 334. Because the evidence is legally insufficient to support the awards for actual damages, we sustain Appellants' first issue. We need not address Appellants' complaint that the evidence is factually insufficient to support the awards of actual damages. *See* TEX.R.APP. P. 47.1.

### BRADY'S LIABILITY

■ In their third issue, Appellants contend that there is no factual or legal basis for Brady's liability. They argue that all of the conduct on which the damages are based occurred before Brady was

incorporated and there is no evidence Brady conspired to cause or contributed to causing any damages to Appellees. We agree.

An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). One of the essential elements of conspiracy is a meeting of the minds on the object or course of action. *Id.* There must be a preconceived plan and unity of design and purpose, for the common design is the essence of the conspiracy. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 857 (Tex.1968).

Swinnea and Snodgrass signed the buyout agreement on August 31, 2001. The damage awards are based on Swinnea's wrongful conduct with regard to the buyout. Brady was incorporated almost a year later, in August 2002. Inasmuch as Brady did not exist at the time of the wrongful conduct for which the trial court compensated Snodgrass and ERI, Brady could not possibly have entered into an agreement with Swinnea regarding the buyout. Therefore, there is no evidence of a meeting of the minds and no evidence of conspiracy between Swinnea and Brady. *See Massey,* 652 S.W.2d at 934. We sustain Appellants' third issue.

## EXEMPLARY DAMAGES

In their fourth issue, Appellants assert that there is no basis for the judgment's punitive damage award. Appellants contend that there are no recoverable actual damages available to sustain any exemplary damages. We agree. Actual damages are a prerequisite to an exemplary damage award. TEX. CIV. PRAC. & REM. CODE ANN. § 41.004 (Vernon Supp.2006); *Wright v. Gifford–Hill & Co.,* 725 S.W.2d

712, 713–14 (Tex.1987). Due to our disposition of Appellants' first issue, there are no actual damage awards remaining. Therefore, the exemplary damage award cannot stand. *See id.* We sustain Appellants' fourth issue.

## MALMEBA'S CAUSE OF ACTION

In their fifth issue, Appellants assert that Malmeba is entitled to judgment for the unpaid lease payments. They argue that ERI has defaulted on its lease with Malmeba and is liable to Malmeba for the unpaid rentals, utilities, and repairs through September 2005 in the amount of $53,837.83.

ERI moved out of the Malmeba building in September 2004, with three years remaining on the lease. Malmeba filed a third party claim against ERI and Snodgrass for anticipatory breach of the lease agreement. Snodgrass testified that ERI was no longer bound by the lease because of Swinnea's wrongful conduct. But, as explained above, the evidence that the lease was consideration for the buyout is of no probative force. *Hubacek,* 159 Tex. at 169, 317 S.W.2d at 32. Parol evidence may not be used to connect two different writings; the connections between them must be evident from the writings themselves. *Foster,* 337 S.W.2d at 493. Thus, there exists an agreement by which ERI repurchased Swinnea's stock in ERI and a separate agreement by which ERI agreed to lease a building from a separate legal entity for a period of six years. There is no evidence that Malmeba breached the lease agreement. The lease was still in effect on September 30, 2004 when ERI moved out of the Malmeba building and ceased paying rent, thus breaching the lease. The lease provides that upon breach by ERI, Malmeba has a choice of remedies. It can terminate the lease, take possession of the building, and

expel ERI, or it can take possession of the building, expel ERI, and relet the building to another lessee.

■ Malmeba sued ERI and Snodgrass for anticipatory breach. Under this theory, Malmeba was required to prove the present value of the rentals to accrue under the lease reduced by the reasonable cash market value of the lease for the unexpired term. *Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 300 (Tex.1997); *Marshall v. Telecommunications Specialists, Inc.*, 806 S.W.2d 904, 907 (Tex.App.-Houston [1st Dist.] 1991, no writ).

Swinnea testified that the lease required monthly rental payments of $3,800.00 from the date ERI moved out until trial and ERI owed $45,600.00 in rent for that twelve month time period. Also, ERI was responsible for taxes, insurance, utilities, and repairs for that time period. He testified that the total damages incurred by Malmeba from the date ERI moved out until the date of trial was $53,837.83. He also indicated that Malmeba asked that "those damages continue to run until" Malmeba can mitigate its damages. He explained that as soon as ERI vacated, he made repairs to the building and listed it with a realtor. His attempts to lease or sell the building had been unsuccessful as of the date of trial. He also testified that the rental value of the building was $2,700.00 to $3,000.00 per month at the time of trial. The record, however, does not contain any evidence of the present value of the rentals to accrue reduced by the reasonable cash market value for the unexpired term.

■ A lessor may not recover rent as it accrues, which may be done under the theory that the lease is in full force and effect, while at the same time recover damages for the remaining months of the lease under an anticipatory breach theory.

*Speedee Mart, Inc. v. Stovall*, 664 S.W.2d 174, 177–78 (Tex.App.-Amarillo 1983, no writ). While we agree ERI defaulted on the lease, Malmeba brought a cause of action for anticipatory breach but did not present evidence of damages under that theory. Accordingly, we sustain Appellants' fifth issue to the extent it complains that ERI breached the lease but overrule Appellants' fifth issue to the extent they ask for recovery of damages for that breach.

## CONCLUSION

The lease executed by Malmeba and ERI cannot be characterized as consideration for the buyout. Therefore, the trial court erred in awarding Snodgrass and ERI $133,200.00 to reimburse them for payments made pursuant to the lease. Because Appellees presented no evidence of actual damages arising out of the buyout, the trial court erred in awarding them $437,500.00 as a portion of the up front cash paid, $150,000.00 as one half the value of Malmeba, and $300,000.00 for loss of income from their business relationship with Merico. It follows that the awards for exemplary damages, prejudgment and postjudgment interest, and attorneys' fees cannot stand. *See First Am. Title Ins. Co. v. Willard*, 949 S.W.2d 342, 352 (Tex.App.-Tyler 1997, writ denied) (op. on reh'g); *Sam Bradley Realty Co. v. McNair*, 644 S.W.2d 533, 536 (Tex.App.-Corpus Christi 1982, no writ). We *reverse* the trial court's judgment as to these awards and *render* judgment that Appellees take nothing on their claims against Appellants.

As *modified,* we *affirm* the trial court's judgment.