

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00377-CV

W. GRAEME ROUSTAN                                                APPELLANT

V.

MICHAEL SANDERSON, WIFE                                          APPELLEES
ANN GAINOUS, AND RIDGLEA
ENTERTAINMENT, INC.

----------

FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In six issues, Appellant W. Graeme Roustan appeals from the trial court's judgment awarding damages to Appellees Michael Sanderson, his wife Ann Gainous, and Ridglea Entertainment, Inc. (collectively S&G) on their breach of contract and fraud claims against him. Because we hold that the evidence is insufficient to support an award of damages against Roustan individually on

----------

[1]See Tex. R. App. P. 47.4.

S&G's breach of contract claim but sufficient to support an award of damages on S&G's statutory fraud claim, we reverse in part and affirm in part.

**Background**

Sanderson and Gainous wanted to start their own ice rink business, and in November 2004, Gainous signed a two-year lease for an ice rink in Fort Worth owned by YDIDI, I LP. The lease contained an option to purchase the property during the lease term. Sanderson and Gainous formed a corporation, Ridglea Entertainment, Inc., to operate the business, and they opened for business in December 2004.

In March 2005, S&G began having equipment problems, which caused problems with the ice. They finally identified and repaired the source of the problem at the end of May 2005. Because of the problem with the ice, the rink had been closed for business from March until the end of June. Meanwhile, in April 2005, Sanderson contacted Roustan, an investor in and operator of a number of other ice rinks, about Roustan buying a controlling interest in the couple's business.

In May 2005, Sanderson and Gainous went to Las Vegas to an ice rink convention and met with Roustan while there. At the meeting, Roustan gave a presentation about his ice rink business venture in which he told Sanderson and Gainous about ice rink facilities he currently owned and others that he planned to acquire in the next few years.

The parties signed a purchase agreement on August 1, 2005, in which a new entity, Roustan Ridglea, LLC (Ridglea LLC) purchased the lease and all of the assets of the ice rink business, except that Gainous kept the $30,000 security deposit that she had paid when she signed the lease. Ridglea LLC agreed to assume the utility contracts for the premises, including the electricity service. Ridglea LLC also agreed to transfer a twenty-five percent ownership interest in the entity to Ridglea Entertainment and to pay $75,000, in two installments of $37,500 each, to Gainous and Ridglea Entertainment. At trial, the parties disputed whether the second installment was ever paid.

At the same time, Gainous executed an assignment of the lease as well as an assignment of the purchase option. As part of the consideration for the agreement, Ridglea LLC agreed to employ Sanderson as general manager of the ice rink and to employ Gainous as a full-time employee.

Ridglea Entertainment and Roustan Inc. (a company of which Roustan is the sole stockholder) also executed an operating agreement for Ridglea LLC. Under the agreement, Roustan Inc. held a sixty-five percent ownership interest in Ridglea LLC. Ridglea Entertainment owned twenty-five percent, and two trusts each took a five percent ownership interest.

The agreement called for Roustan Inc. to make a $150,000 capital contribution to Ridglea LLC, with $20,000 paid prior to formation and the remaining $130,000 due upon formation. Ridglea Entertainment's capital contribution consisted of its assignment of its interest in the ice rink and its sale

3

of all of the business assets as set out in the purchase agreement. Roustan made an advance of $20,000 prior to closing on the purchase agreement and another $55,000 around the time of closing. The parties disputed at trial whether Roustan Inc. ever satisfied the rest of its capital contribution.

Attached to the agreement as Exhibit 2 was an unexecuted promissory note, dated July 1, 2005, under which Ridglea LLC promised to pay the Fernandez Family Trust a sum of $200,000 plus interest over a period of three years. The operating agreement provided that Roustan, the managing member, was authorized to pay the note "as set forth in Exhibit '2.'" This trust was not one of the two trusts that received a five percent membership interest in Ridglea LLC.

By October 2005, Ridglea LLC did not have enough money in its account to pay all of its bills, and the business was not generating enough income to cover them. Roustan had not had the utilities transferred out of Gainous's name, and in the spring of 2006, the business began getting shut-off notices from the utility company for failure to pay the rink's bills. S&G paid these bills with their personal charge cards.

In September 2006, the business continued to have trouble making money, and Roustan informed S&G that he would not put any more money into the business. That same month, the electricity was shut off for failure to pay the bill, and S&G paid $22,000 to have the service turned on again. S&G also received notice that month that there were insufficient funds to make payroll.

4

Sanderson and Gainous notified Roustan that they would be taking the revenue from the ice rink and putting it in Ridglea Entertainment's account. They paid the rent for October and November. After accepting that rent, YDIDI notified S&G that the September rent had not been paid and that the lease was in default. They sent a check to YDIDI, but the entity held the check and, in December, evicted S&G. The next day, the rink opened up again for business, now under the management of Firland Management LLC, a company used by Roustan to manage other ice rinks in which he invests.

During this time, Roustan's lawyer was negotiating with YDIDI for a new lease and new purchase option, but with a new company instead of with Ridglea LLC. On November 30, 2006, Roustan sent an email to a YDIDI representative stating that

> [f]rom what I hear, [Sanderson] is having trouble getting an Insurance Certificate for Ridglea Entertainment, Inc. If your lawyer demands to see one in 5 days, he might not be able to get one and would be in default . . . . even though my policy is still in effect. I am pretty certain he will come up with the September rent and December rent. Just a thought.

The YDIDI representative responded, "I have forwarded your message to our attorney . . . who is working on a specific notice to Sanderson. I am confident we will be able to prevail in the end." On December 18, 2006, the day after S&G were locked out of the ice rink, Roustan registered a new corporation, Roustan Fort Worth, LLC, with the Texas Secretary of State, using the ice rink's address as the registered address.

5

S&G filed suit against Roustan; Ridglea LLC; Roustan Fort Worth, LLC; YDIDI; and Firland Management, LLC.[2] S&G's petition contained a seven-paragraph section with the heading "Causes of Action Against the Roustan Defendants." In the first paragraph of that section, they alleged that Roustan had made false representations "concerning his business acumen, his financial strength[,] and his commitment to funding the new company to which [S&G] sold the business." S&G then stated a claim "for common law fraud and statutory fraud pursuant to Tex. Bus. & Com. Code § 27.01."

In a separate paragraph in that section, S&G included the following claim: "Ridglea LLC failed to pay the second [half] of the purchase price and thereby breached the contract of Purchase and Sale. The breach of contract by [Ridglea LLC] resulted in damages to [S&G]."

After a trial, a jury found that Roustan had failed to comply with his agreement to pay Sanderson and Gainous $75,000 for the transfer of the ice rink business, and it assessed their damages at $37,500. The jury further found that Roustan had not failed to make the agreed $150,000 capital contribution and that he did not agree to contribute the money for payment of Ridglea LLC's operating expenses.

The jury also found that Roustan did not commit common law fraud against S&G and that he did not "engage in any false, misleading, or deceptive act or

---

[2]They subsequently dismissed their claims against Firland and YDIDI.

practice that [S&G] relied on to their detriment and that was a producing cause of damages to [S&G]." The jury did find that Roustan committed statutory fraud against S&G, but it awarded statutory fraud damages only to Ridglea Entertainment, in the amount of $50,000.

Roustan filed a motion for judgment notwithstanding the verdict. The trial court denied the motion and entered judgment ordering that Sanderson and Gainous recover from Roustan $37,500 plus prejudgment interest and that Ridglea Entertainment recover from Roustan $50,000.

**Analysis**

Roustan's first two issues relate to S&G's breach of contract claim. His third, fourth, fifth, and sixth issues relate to S&G's statutory fraud claim.

*Breach of Contract Claim*

In Roustan's second issue, he argues that the evidence is legally and factually insufficient to support the jury's verdict on S&G's breach of contract claim because there is no evidence that Roustan made any agreement with them in his personal capacity. We agree.

The jury found that Roustan had agreed to pay Sanderson and Gainous $75,000 for the transfer of the ice rink business. The agreement regarding the transfer of the business was contained in the purchase and sale contract, which was between S&G and Ridglea LLC, not Roustan individually. Roustan signed the agreement as president of Roustan, Inc., which signed as the managing member of Ridglea LLC. Accordingly, Ridglea LLC may be liable for a breach of

7

the contract to which it is a party, but Roustan as an officer may not be held individually liable.[3] Roustan could, through his actions, cause Ridglea LLC to breach the agreement,[4] but because he was not a party to the contract, he could not personally breach it.[5] S&G did not plead any facts or provide sufficient evidence to support a ground for ignoring the limitation on liability afforded to limited liability companies and did not allege that the limitation should be disregarded.[6] By statute, a member of a limited liability company is not liable for

---

[3]*See Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006) ("A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations.").

[4]*See In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 762 (Tex. 2006) (orig. proceeding) (noting that "corporations must act through human agents").

[5]*See Bernard Johnson, Inc. v. Cont'l Constructors, Inc.*, 630 S.W.2d 365, 369 (Tex. App.—Austin 1982, writ ref'd n.r.e.) ("As a general rule, a suit for breach of contract may not be maintained against a person who is not a party to the contract.").

[6]*See Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986) (setting out six grounds on which the corporate form may be disregarded), *superseded in part by* Act effective Sept. 1, 1997, 75th Leg., R.S., Ch. 375, § 7, 1997 Tex. Gen. Laws 1522, 1522–23 (amended 2003 & 2007) (current version at Tex. Bus. Orgs. Code Ann. § 21.223 (West 2010)); *see also SSP Partners v. Gladstrong Inv. (USA) Corp.*, 275 S.W.3d 444, 451–52 (Tex. 2008) (stating that the limitation on corporate liability may be ignored "only 'when the corporate form has been used as part of a basically unfair device to achieve an inequitable result'"); *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 590 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (noting that Texas courts have applied to limited liability corporations the same state law principles for piercing the corporate veil that they have applied to corporations).

a debt, obligation, or liability of the company.[7] Fraud is a ground for disregarding the corporate form,[8] but although S&G pled that Roustan fraudulently induced them to enter a contract, they did not plead that Roustan used the LLC itself to perpetrate a fraud and that, consequently, the corporate form should be disregarded and Roustan held individually liable.[9] Nor did they plead any other ground for disregarding the corporate structure.[10]

S&G argue in their brief that they "had always understood that Roustan would be paying the $75,000 cash portion of the purchase price[,] and it was not until shortly before closing when they received the purchase agreement that they understood Roustan had put a provision in the purchase agreement that the new company would be paying the second half." They then contend that they "had a conversation with Roustan about their concerns with capital calls and Roustan

---

[7]Act effective Aug. 26, 1991, 72nd Leg., R.S., Ch. 901, § 46, 1991 Tex. Gen. Laws 3192, 3203 (now renumbered and codified at Tex. Bus. Orgs. Code Ann. § 101.114 (West 2010)).

[8]*See Castleberry*, 721 S.W.2d at 272.

[9]*Cf. Houston-Am. Life Ins. Co. v. Tate*, 358 S.W.2d 645, 657 (Tex. Civ. App.—Waco 1962, no writ) (holding that the corporate fiction was used to perpetrate a fraud and that adherence to the corporate fiction "would promote injustice and lead to a most inequitable result").

[10]*See Castleberry*, 721 S.W.2d at 272; *see also Blond Lighting Fixture Supply Co. v. Funk*, 392 S.W.2d 586, 591 (Tex. Civ. App.—San Antonio 1965, no writ) (holding that there was no justification for disregarding the corporate form when the plaintiffs did not present evidence that the corporation was formed as a means of perpetrating fraud, that it was operated as a mere tool of another corporation or as the alter ego of an individual, that the corporate form was being used as a means of evading existing obligations, or that the corporation was used to circumvent a statute, protect crime, or justify wrong).

9

had told them that he would personally pay any monetary shortfalls during the first [twelve] months of the operation of the company," and they therefore "had every reason to believe that Roustan was standing by his personal commitment on the purchase price."

S&G may have put on some evidence of statements Roustan made before or after the contract's formation about the source of funding for the $37,000, but they did not put on evidence of a separate contract with Roustan personally to pay them the money. The only contract that they pled had been breached was the purchase agreement, and this was the only agreement that they proved existed.[11] Roustan was not a party to this agreement, and S&G did not put on evidence to support the disregarding of the corporate form to hold him personally liable.[12] Because they neither pled nor proved a ground for setting aside the corporate form to hold Roustan personally liable on the purchase agreement, and because they neither pled nor proved a separate contract with Roustan, he cannot be held individually liable for breach of contract.[13] Accordingly, applying the appropriate standard of review,[14] we sustain Roustan's second issue.

---

[11]*See Fieldtech Avionics & Instruments, Inc. v. Component Control.Com, Inc.*, 262 S.W.3d 813, 825 (Tex. App.—Fort Worth 2008, no pet.) (stating that the elements of a breach of contract claim include the existence of a valid contract).

[12]*See Castleberry*, 721 S.W.2d at 272.

[13]*See Bernard Johnson, Inc.*, 630 S.W.2d at 369.

[14]*Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005); *Uniroyal*

Because S&G failed to establish a basis for holding Roustan personally liable, we do not need to reach Roustan's first issue, in which he argues that the pleadings did not support a verdict of personal liability on the contract.[15]

*Statutory Fraud*

The remainder of Roustan's issues relate to the jury's verdict of statutory fraud. In his third issue, he argues that there is no evidence that he made any representation that was false.

S&G pled a claim for fraud involving real estate or corporate stock under section 27.01 of the business and commerce code.[16] To show fraud under section 27.01, a plaintiff may prove either (1) a false representation of a material fact or (2) a false, material promise to do an act.[17] If the plaintiff's claim is based on a false representation of fact, the plaintiff must show a "false representation of a past or existing material fact, when the false representation is . . . made to [the plaintiff] for the purpose of inducing [the plaintiff] to enter into a contract; and . . . relied on by [the plaintiff] in entering into that contract."[18] If the claim is based on a false promise to act, the plaintiff must show that the false promise was material,

---

*Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999).

[15]*See* Tex. R. App. P. 47.1.

[16]Tex. Bus. & Com. Code Ann. § 27.01(a) (West 2009).

[17]*Id.*

[18]*Id.*

11

made to the plaintiff with the intention of not fulfilling it and for the purpose of inducing the plaintiff to enter into a contract, and that the plaintiff relied on the promise in entering into that contract.[19]

The jury charge tracked section 27.01, instructing the jury that statutory fraud can occur when either (a) there is a false representation of a past or existing material fact or (b) a party makes a false promise to do an act. In the short section of Roustan's appellate brief addressing this issue, he asserts that "[t]here was no evidence of any representation by [him] that was false in any respect." He does not, however, argue that there is no evidence that he made a promise to do something with the intention of not fulfilling it.

In his reply brief, however, Roustan does make one argument regarding the evidence to support a finding of a false promise in a sentence in a footnote of the brief. He states that testimony suggesting that he failed to perform on any of his promises cannot support a fraud claim because Texas cases have consistently held that failure to perform an agreement cannot support a fraud claim. We agree with the statement that under Texas law, proof of the failure to perform, *without more*, does not establish fraud.[20] But circumstantial evidence may be used to establish that, when making the promise, the party had no

[19]*Id.*

[20]*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).

12

intention to perform.[21]   A party's acts after the promise was made, the party's denial that he ever made a promise, and no pretense of performance are all factors that may be considered to show a lack of intent.[22]

Roustan makes no argument that the evidence was insufficient to show that in order to induce S&G to enter into a contract, he made a promise with the intention of not fulfilling it.   Furthermore, Gainous's and Sanderson's testimony indicates that Roustan led them to believe that he and his business enterprise had the financial wherewithal to provide the funding to keep their business going and that he would in fact provide the funding.   The emails from Roustan in the record do nothing to contradict this testimony.   For example, when the parties were still negotiating the deal, Roustan told Sanderson that *he* would pay $20,000 up front and then, after formation of the LLC and the assignment of the lease, "[*he*] would then provide an additional $130,000."   [Emphasis added.] Roustan did nothing to disillusion S&G after they formed the LLC; in February 2006, Sanderson asked Roustan about the second payment of $35,000, and in response Roustan asked them to wait on payment because "it would make life easier on [*him*]."   [Emphasis added.]   No mention was made of funding the business by taking out a loan.   Neither the operating agreement nor the note

---

[21] *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986).

[22] *See id.*; *see also Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009) ("[A] party's intent is determined at the time the party made the representation, [but] it may be inferred from the party's subsequent acts after the representation is made.") (quoting *Spoljaric*, 708 S.W.2d at 434).

attached to it indicated that the trust loan was not an additional source of funds and was instead the primary source of Roustan's contribution to the LLC. The evidence in the record was enough for the jury to conclude that Roustan told S&G that he could and would provide a capital contribution of $150,000, either with his own funds or with the financial resources of his business, but that he actually borrowed money on behalf of the LLC. The record therefore contains sufficient evidence that Roustan made a promise to S&G that went unfulfilled.

Roustan does not argue that, even if he did not follow through on a promise, such promise was nevertheless not made with an intention not to fulfill it. Even if he had so argued, however, our conclusion would be the same. From Roustan's testimony about how he structures business deals, his opinion about the note's satisfaction of his capital obligation, and the operating agreement's provision making repayment of the loan the obligation of the LLC rather than Roustan, Inc., the jury could have concluded that Roustan never intended to make a capital contribution from his own funds or the funds of Roustan, Inc. and that he had always intended to fund the business by way of a debt that the LLC would have to repay. Accordingly, the jury could have found that Roustan's borrowing money to fund the LLC and making the LLC liable for the repayment satisfied Roustan's obligation to make a capital contribution but at the same time violated his promise to S&G that he personally could and would fund the company.

Roustan does not argue that the promise to provide funding out of his own funds or his business's funds was not material. Nor does he argue that the evidence was not sufficient to show that S&G relied on the promise or to show that the promise was made to induce them to sign the purchase and sale agreement and the assignments. Accordingly, we do not address the sufficiency of the evidence as to those elements of S&G's claim. We overrule Roustan's third issue.

In his fourth issue, Roustan argues that the judgment does not conform to the pleadings. The entirety of his argument on this issue is as follows:

> [Texas Rule of Civil Procedure] 301 requires a judgment to conform to the pleadings. As mentioned above, [S&G] assert in the [p]etition that Roustan made false "representations concerning his business acumen, his financial strength and his commitment to funding the new company." . . . However, as discussed above, such representations (even if made) cannot support a judgment of fraud under Texas law[.] *See, Stephanz v. Laird*, 846 S.W.2d [895,] 903 [(Tex. App.—Houston [1st Dist.] 1993, writ denied)]. Thus, the [j]udgment against Roustan for statutory fraud does not conform to the pleadings.

Roustan expands on his argument somewhat in his reply brief, in which he asserts that as a matter of law, the allegations that he made false "representations concerning his business acumen, his financial strength and his commitment to funding the new company" cannot support a claim for fraud because "the representation complained of must concern a 'material fact' and not 'a mere matter of opinion, judgment, probability, or expectation.'" Thus, he argues, the petition failed to plead any grounds that would support a fraud claim.

In the case relied on by Roustan, the court looked to see if the evidence supported a finding of misrepresentation, not a finding of a false promise to do an act. Roustan does not explain why the pleadings cannot support a judgment that he committed statutory fraud based on a false promise.

In the paragraph of the pleadings pointed out by Roustan, S&G did state that Roustan made false representations about his business ability, his finances, and his commitment to funding the new company. They assert that these representations were made with knowledge of their falsity with the intent of inducing them to enter into the purchase and sale agreement, and "[S&G] assert an action for common law fraud and statutory fraud pursuant to Tex. Bus. & Com. Code § 27.01" based on the purchase and sale agreement and the assignments. But S&G did not limit their statutory cause of action to a claim based on false representations under section 27.01(a)(1). And in their pleadings, S&G alleged that Roustan misled them about his commitment to funding the new company and that Roustan had represented to them that he had financial capital to put into the business and to exercise the purchase option "so that the new entity he would form would own the [p]roperty." Although S&G used the term "representations," a term that generally relates to assertions of fact rather than promises, these statements were sufficient to put Roustan on notice of a claim based on statements by him that he would perform acts in the future with respect

16

to funding the new company and purchasing the property.[23] Roustan makes no argument about why, if S&G proved that Roustan made promises about funding the business, such promises could not serve as the basis of a section 27.01(a)(2) claim.[24] The pleadings can support a judgment for statutory fraud based on a false promise, and, accordingly, we overrule this issue.

In Roustan's fifth issue, he argues that the jury's finding that he committed statutory fraud was inconsistent with its findings as to common law fraud. In reviewing the jury findings for conflict, a court may not strike down jury answers as conflicting if there is any reasonable basis upon which they can be reconciled.[25] The question for this court is not whether the findings may reasonably be viewed as conflicting but whether there is any reasonably possible basis upon which they may be reconciled.[26]

In Roustan's original brief, he does not explain why the jury's findings are inconsistent and irreconcilable.[27] In his reply brief, however, he argues that

---

[23] See Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 896–97 (Tex. 2000) (noting that Texas follows a fair notice standard for pleading, that a petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim, that when a party fails to specially except to a pleading, a court should construe the pleadings liberally in favor of the pleader, and that "it is hard to imagine that [Appellee] was unaware of exactly what [Appellant] was claiming").

[24] See Tex. R. App. P. 38.1(i).

[25] Bender v. S. Pac. Transp. Co., 600 S.W.2d 257, 260 (Tex. 1980).

[26] Id.

[27] See Tex. R. App. P. 38.1(i).

under the common law fraud question, the jury found that he did not make a false representation, but the jury's answer to statutory fraud requires a finding that he did make a false representation. Thus, he argues, the findings are in conflict and are irreconcilable.

We disagree. The jury's answers are not irreconcilable. The jury charge on common law fraud limited liability to the making of misrepresentations, which the charge defined as a false statement of fact or opinion. The statutory fraud definition, however, allowed the jury to find that Roustan had committed fraud *either* by making a misrepresentation *or* by making a false promise to do an act. The jury could have found that Roustan did not make a false statement of fact or opinion and therefore did not commit common law fraud but that Roustan *did* make a false promise to do an act and therefore did commit statutory fraud.

Furthermore, when the jury returned its verdict, Roustan did not object to the findings as conflicting.[28] We overrule this issue.

In his sixth issue, Roustan contends that the trial court submitted an improper instruction on damages concerning statutory fraud. The jury charge asked the jury,

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [S&G] for their damages, if any, that resulted from such statutory fraud?

---

[28]*See Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 861 (Tex. App.—Fort Worth 2003, pet. denied) (holding that the appellants did not preserve complaint about conflicting jury findings because they failed to object to the conflict before the jury was discharged).

Consider the following elements of damages, if any, and none other:

> 1. The economic losses, if any, suffered by [S&G] caused by the [statutory] fraud.

The jury charge instructed the jury to determine "economic losses" but did not define that term. In Roustan's brief on appeal, he argues that the measure of damages for fraud was discussed by the Supreme Court of Texas in *Formosa Plastics*,[29] in which that court stated that Texas recognizes two measures of direct damages for fraud: out-of-pocket and benefit-of-the-bargain. Thus, Roustan argues, the trial court's instruction was contrary to Texas law because the proper measure of damages for a fraud claim is either out-of-pocket damages or benefit-of-the bargain damages.

Section 27.01 provides that a plaintiff under that section may recover "actual damages," and, in some cases, exemplary damages.[30] The statute does not define the term "actual damages," so we look to the common law for guidance.[31] Under the common law, both out-of-pocket and benefit-of-the-

---

[29]960 S.W.2d at 49.

[30]Tex. Bus. & Com. Code Ann. § 27.01(b), (c).

[31]*Hawkins v. Walker*, 233 S.W.3d 380, 391–92 (Tex. App.—Fort Worth 2007, no pet.) (applying without discussion the common law measure of damages for fraud in a section 27.01 statutory fraud case); *see also Swinnea v. ERI Consulting Eng'rs, Inc.*, 236 S.W.3d 825, 836 (Tex. App.—Tyler 2007) (looking to the common law for guidance and stating that "[t]he measure of damages recoverable under [s]ection 27.01 is the same as that under a claim of common law fraud"), *rev'd in part on other grounds*, 318 S.W.3d 867 (Tex. 2010).

bargain damages are methods of measuring direct actual damages.[32] Economic damages are measured the same way, and in fact courts often use the terms "economic damages" and "actual damages" interchangeably.[33] Thus, the jury charge set forth the correct kind of damages recoverable on a statutory fraud claim. To the extent that the terms are not interchangeable, Roustan was not harmed by the trial court's use of the term "economic damages" instead of "actual damages" because "actual damages" could have allowed for greater recovery in that "actual damages" can include both economic and non-economic damages.[34] In sum, out-of-pocket and benefit-of-the-bargain are both measures of "actual damages" and of "economic damages."

In his reply brief, Roustan argues that a proper instruction on damages would have "set forth" the "out-of-pocket" and "benefit-of-the-bargain" measures. We construe Roustan's issue liberally to argue, not that the instruction failed to

---

[32] *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) (stating that under the common law, actual damages can be either direct or consequential and that direct damages for misrepresentation may be measured as out-of-pocket or as benefit-of-the-bargain damages); *Everett v. TK-Taito, L.L.C.,* 178 S.W.3d 844, 858 (Tex. App.—Fort Worth 2005, no pet.) (noting that "out-of-pocket" and "benefit-of-the-bargain" are the two common law measures of economic damages).

[33] *See Matheus v. Sasser*, 164 S.W.3d 453, 458 (Tex. App.—Fort Worth 2005, no pet.) (noting that current version of the Deceptive Trade Practices Act provides for "economic damages," that the prior version called for "actual damages," and that we had found no case suggesting that the terms had any difference in meaning).

[34] *See, e.g., Latham v. Castillo*, 972 S.W.2d 66, 69 (Tex. 1998) (noting that mental anguish damages are actual damages recoverable at common law for some torts).

*name* the proper measure of damages recoverable, but that it failed to instruct the jury on *how* to calculate those damages, that is, that the charge should have instructed the jury to determine either the difference between the value S&G paid and the value of what they received (out-of-pocket damages) or the difference between the value as represented and the value as received (benefit-of-the-bargain damages).[35]

In the charge conference, Roustan's attorney objected to the damages question, stating that

> the measure of damages stated here is not one of the measures of damages for fraud recognized by Texas law. It just says the economic losses. And the proper definitions for fraud would be benefit of the bargain or out-of-pocket or one of the other recognized measures, and *this is not one of them*. [Emphasis added.]

This objection was not sufficient to advise the trial court of Roustan's objection that the charge was defective for failing to instruct the jury how to calculate benefit-of-the-bargain damages and out-of-pocket damages. Roustan argued only that economic losses were not a proper measure of fraud damages. Thus, to the extent that Roustan argues that the trial court should have instructed the jury on how to calculate the damages, he has not preserved the complaint.[36] To the extent that Roustan's reply brief merely repeats the argument from his original brief, the argument is overruled because "economic losses" are an

---

[35] *See Arthur Andersen*, 945 S.W.2d at 817 (defining out-of-pocket and benefit-of-the-bargain damages).

[36] *See* Tex. R. App. P. 33.1.

appropriate measure of damages for the statutory fraud claim alleged.  We overrule Roustan's sixth issue.

## Conclusion

Having sustained Roustan's second issue, we reverse the part of the trial court's judgment awarding S&G damages on their breach of contract claim and render judgment that they take nothing on the breach of contract claim.  We affirm the remainder of the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, WALKER, and GABRIEL, JJ.

GABRIEL, J. concurs without opinion.

DELIVERED:  September 29, 2011

22